UNITED STATES of America, Appellant,

v.

David HILTON, Defendant, Appellee.

No. 98–1513.

United States Court of Appeals,
First Circuit.

Jan. 27, 1999.

Rehearing and Suggestion for Rehearing En Banc Denied March 1, 1999.

F. Mark Terison, Assistant United States Attorney, with whom Jay P. McCloskey, United States Attorney, and Gail Fisk Malone, Assistant United States Attorney, were on brief for appellant.

Peter E. Rodway for appellee.

Lisa R. Green, Michael A. Bamberger, and Sonnenschein Nath & Rosenthal, for American Booksellers Foundation For Free Expression, Freedom To Read Foundation, International Periodical Distributors Association, Periodical and Book Association of America, Inc., Publishers Marketing Association, Video Software Dealers Association, General Media Communications, Inc.; R. Bruce Rich and Jonathan Bloom for Association of American Publishers, Inc., on brief for amici curiae.

Before BOUDIN, Circuit Judge, COFFIN and BOWNES, Senior Circuit Judges.

BOWNES, Senior Circuit Judge.

In 1996, Congress enacted the Child Pornography Prevention Act (the "CPPA"), 18 U.S.C. § 2252A, to attack the rise of computerized or "virtual" child pornography. These images may take many forms—a photograph of a real child may be scanned and replicated, an innocent picture of a child may be manipulated by computer to create a sexually-oriented photo, or a fake child (ranging from a simple cartoon character to a high-resolution image resembling a real child) can be generated wholly by computer graphics.

The law prohibits, *inter alia*, knowing possession of visual images depicting minors or those who "appear to be" minors engaging in sexually explicit conduct. This case presents constitutional issues of first impression in this circuit: whether the CPPA's definition of child pornography is so overbroad as to contravene the First Amendment or so vague as to violate due process.

In resolving defendant David Hilton's motion to dismiss the indictment in his favor, the United States District Court for the District of Maine answered both questions in the affirmative. The court was troubled by a perceived difficulty in determining whether a depicted person appeared to be under 18 years old and by its belief that the statute impermissibly criminalizes possession of adult pornography.

We reverse. We hold that the law, properly construed, survives Hilton's facial constitutional challenge. It neither impinges substantially on protected expression nor is so vague as to offend due process.

**I**

We assess the constitutionality of the CPPA de novo. *See United States v. DeLuca*, 137 F.3d 24, 40 n. 19 (1st Cir.1998). In doing so, we must carefully consider fundamental constitutional norms in light of recent technological advances to determine whether Congress's objectives and the statutory scheme it has established are in accord with our constitutional design.

We begin by providing an overview of the CPPA and by considering the underlying legislative purposes of the Act. Congress enacted the CPPA to modernize federal law by enhancing its ability to combat child pornography in the cyberspace era.[1] *See* S.Rep. No. 104–358, at pt. I (1996) (declaring that statute addresses "problem of 'high-tech kiddie porn' "). Lawmakers wished to improve law enforcement tools to keep pace with technological improvements that have made it possible for child pornographers to use computers to "morph" or alter innocent images of actual children to create a composite image showing them in sexually explicit poses. Through readily available desktop computer programs, one can even create a realistic picture of an imaginary child engaged in sexual activity and pass off that creation as an image of a real child.

The statute's operative provisions, taken together, criminalize the reproduction, possession, sale, and distribution of child pornography. *See* 18 U.S.C. § 2252A(a). They also prohibit the pandering of material as child pornography by making it a crime to advertise, promote, or present material "in such a manner that it conveys the impression

---

1. The United States is one of several countries that have begun to grapple with the effects of the technological revolution on the child pornography trade. Canada, for example, recently updated its child pornography laws by banning visual representations that show a person "who is or is depicted as being under the age of eighteen years and is engaged in or is depicted as engaging in explicit sexual activity." Criminal Code, R.S.C., ch. C–46, § 163.1(1)(a)(i) (1998) (Can.). Likewise, Great Britain's child pornography laws reach "pseudo-photographs" created by computer and provide that "[i]f the impression conveyed by a pseudo-photograph is that the person shown

is a child, the pseudo-photograph shall be treated for all purposes . . . as showing a child." Protection of Children Act, 1978, § 7(8), amended by Criminal Justice and Public Order Act, 1994, § 84(3)(c) (Eng.).

The challenges of regulating virtual child pornography have spawned a wealth of scholarly commentary. *See, e.g.*, Lesli C. Esposito, *Regulating the Internet: The New Battle Against Child Pornography*, 30 Case W. Res. J. Int'l L. 541 (1998); Marty Rimm, *Marketing Pornography on the Information SuperHighway*, 83 Geo. L.J. 1849 (1995).

that the material is, or contains" child pornography. 18 U.S.C. § 2256(8)(D).

The statute defines child pornography as: any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where—(A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; (B) such visual depiction is, or appears to be, of a minor engaging in sexually explicit conduct; (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct; or (D) such visual depiction is advertised, promoted, presented, described, or distributed in such a manner that conveys the impression that the material is or contains a visual depiction of a minor engaging in sexually explicit conduct. . . .

18 U.S.C. § 2256(8). A "visual depiction" includes—but is not necessarily limited to— "undeveloped film and videotape, and data stored on computer disk or by electronic means which is capable of conversion into a visual image." 18 U.S.C. § 2256(5). A "minor," in turn, means "any person under the age of eighteen years." 18 U.S.C. § 2256(1). Sexually explicit conduct is described as "actual or simulated—(A) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same sex or opposite sex; (B) bestiality; (C) masturbation; (D) sadistic or masochistic abuse; or (E) lascivious exhibition of the genitals or pubic area of any person." 18 U.S.C. § 2256(2).

■ There is some overlap in the definition of child pornography—material created by manipulating an image of an "identifiable minor" [2] would typically, but not necessarily,

appear to be of a minor; similarly, an image showing an actual minor would probably also "appear to be a minor." On the other hand, images of a purely fictional child might only satisfy the "appears to be a minor" test. Under the statutory framework established by Congress, a defendant charged with unlawful distribution or sale would be entitled to a complete defense by showing that the person depicted actually was an adult (provided that the material was not promoted or presented to give the impression that it depicts an actual minor). *See* 18 U.S.C. § 2252A(c). The affirmative defense is not made available, however, to those charged with unlawful possession of child pornography.[3]

Congress broadened the scope of federal anti-child pornography statutes to address a set of related concerns aimed at the ultimate goal of destroying the underground supply of child pornography in all of its manifestations. First, the legislature desired to reduce the sheer volume of computerized child pornography that could be used by child molesters and pedophiles to "stimulate or whet their own sexual appetites." S. Rep. 104–358, at pt. IV(B).

Second, Congress sought to ban computer-generated images that are "virtually indistinguishable" from those of real children, but are made without live children. *Id.* These images can be created with very little expense, and often are bought, sold, or traded in the same manner as images created through the use of real children. They can be downloaded from Internet sites, viewed on computer screens, or stored on hard drives or floppy disks for later use. Until now, such materials were largely beyond the reach of federal law, which had focused on representations of actual minors.

Third, the new law was designed to protect the privacy of actual children whose innocu-

---

**2.** An identifiable minor is a person (1) who was a minor at the time the depiction was created or altered; (2) whose image is used to create, adapt, or modify the visual depiction at issue; and (3) who is "recognizable as an actual person by the person's face, likeness, or other distinguishing characteristic, such as a unique birthmark or other recognizable feature." *See* 18 U.S.C. § 2256(9)(A).

**3.** Section 2252A(c) specifies that those charged with certain offenses might be entitled to this defense by referencing every operative provision except the one that prohibits possession of child pornography.

ous images are altered to create sexually explicit pictures. Lawmakers hoped to deter the creation of such invasive material and encourage the destruction of that which currently exists. *See id.* at § 2(7).

Fourth, Congress wished to deprive child abusers of a "criminal tool" frequently used to facilitate the sexual abuse of children. After hearing from an array of experts, Congress specifically found that virtual pornography created without the involvement of real minors (often via computer technology alone) is increasingly used by pedophiles and child molesters to seduce or entice children into participating in sexual activity by breaking down their natural inhibitions. Congress determined that "a child who is reluctant to engage in sexual activity with an adult, or to pose for sexually explicit photographs, can sometimes be convinced by viewing depictions of other children 'having fun' participating in such activity." *Id.* at § 2(3). This material is routinely used to instruct children how to perform certain sexual acts. Images made by manipulating an innocent picture of a real child to show sexual conduct can also be used to blackmail that child into submitting to abuse and remaining in fearful silence about it. Congress deemed the threat of these forms of physical and emotional abuse to be as grave as when images of real children are used, for a child shown a computer-generated image cannot be expected to know whether the child portrayed in an image is that of a real child or merely a fanciful creation.

## II

We recount the relatively short history of this case. On December 17, 1997, a federal grand jury indicted Hilton for criminal possession of computer disks containing three or more images of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). Well before trial, Hilton moved to dismiss the indict-ment, mounting solely a facial attack on the CPPA. He argued that the statute, by its terms, was unconstitutionally vague and overbroad, and therefore unenforceable.

On March 26, 1998, the United States District Court for the District of Maine agreed. The court determined that the CPPA was a content-neutral regulation "designed to ameliorate significant harmful secondary effects of the protected speech rather than suppress the speech itself." *United States v. Hilton,* 999 F.Supp. 131, 134 (D.Me.1998). Nevertheless, the court concluded that the statutory definition of "child pornography" was both vague and overbroad. It found the "appears to be a minor" language overly subjective, creating "substantial uncertainty for viewers presented with materials depicting post-pubescent individuals" because it may be difficult to distinguish between teenagers and young adults. *Id.* at 136. The court further found the definition unconstitutionally overbroad, impacting a "significant amount of adult pornography featuring adults who appear youthful." *Id.* at 137. Despite holding this portion of the CPPA's definition of child pornography unconstitutional, the district court made no effort to ascertain the impact of its ruling on the statute as a whole by examining and applying the statute's severability clause.[4] Instead, it simply dismissed the indictment. The government now appeals.

## III

The government attacks the district court's analysis in several critical respects. It first questions the lower court's conclusion that the statute is overbroad. In its view, the CPPA does not reach innocuous pictures of children or criminalize protected adult pornography. The government also takes issue with the district court's determination that the Act is too vague. The government urges us to hold that the statute allows persons of

---

4. Congress contemplated the possibility that this law would be challenged in court. Accordingly, it specifically provided that, if some aspect of the definition were to be found unconstitutional, the invalidation of one element of the definition would not necessarily render inoperable the entire statutory framework. *See* CPPA, Pub.L. No. 104–208, § 8, 110 Stat. 3009, 3009–31 (1996) ("if any provision of this Act, including any provision or section of the definition of the term child pornography, ... is held to be unconstitutional, the remainder of this Act, including any other provision or section of the definition of the term child pornography, ... shall not be affected thereby").

ordinary intelligence to determine what types of material are banned and to conform their conduct accordingly. To require further specificity, it insists, would be not only impractical, but unrealistic. Additionally, the government asks us to deem the "appears to be a minor" standard to be grounded in prosecutorial necessity because it is exceedingly difficult, if not impossible, for an expert to discern whether an image is one of a real child. The broadening of the definition of child pornography is critical, the government argues, because in more and more cases involving virtual child pornography, the prosecution is unable to prove that real children under a specified age are depicted.

◼ We turn our attention to familiar constitutional terrain. The First Amendment declares that "Congress shall make no law . . . abridging freedom of speech." U.S. Const. amend. I. We offer a few words about the doctrines that have developed over time to give meaning to the protective force of the First Amendment. In general, laws that aim only to prescribe the conditions under which certain speech may be carried out may be upheld as neutral time, place or manner restrictions. See United States v. Grace, 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) ("[T]he government may enforce reasonable time, place, and manner regulations as long as the restrictions 'are content neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'") (citation omitted). But a statute or regulation that discriminates based on the content of the speech itself typically must comport with the following standards to survive a constitutional challenge: it must be (1) animated by one or more compelling state interests; and (2) narrowly tailored toward fulfilling those concerns. Nevertheless, certain types of expression—chief among them fighting words, libel, and obscenity—are unprotected altogether. See R.A.V. v. City of St. Paul, 505 U.S. 377, 383–85, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). Child pornography falls into the category of unprotected speech. See New York v. Ferber, 458 U.S.

747, 764, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). Finally, an otherwise valid law may be so overbroad that it encroaches on protected expression or so vague that prosecuting a person under the statute would effectively deprive that person of due process of law. See Kolender v. Lawson, 461 U.S. 352, 357–58, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983).

◼ For the sake of clarifying this area of law, we find it necessary to point out that the district court misapplied the time, place or manner doctrine by mistaking the CPPA for a content-neutral law. A distinct line of cases upholds reasonably-crafted regulations where the state acts not to suppress certain speech but to direct, in a content-neutral way, how or when that speech may be expressed in the public sphere. See, e.g., United States v. Kokinda, 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (upholding federal regulation prohibiting solicitation on postal property). Still, "[a]ny restriction on speech, the application of which turns on the content of the speech, is a content-based restriction regardless of the motivation that lies behind it." Boos v. Barry, 485 U.S. 312, 335–36, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (Brennan, J., concurring). Of course, if a law is directed at the impact of the speech on its viewers, it cannot be evaluated as a time, place or manner restriction. See Reno v. American Civil Liberties Union, 521 U.S. 844, 117 S.Ct. 2329, 2342–43, 138 L.Ed.2d 874 (1997) (rejecting argument that Communications Decency Act, which banned on-line transmission of "obscene or indecent" messages, was time, place or manner regulation); Forsyth County v. Nationalist Movement, 505 U.S. 123, 134, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) ("Listeners' reaction to speech is not a content-neutral basis for regulation.").

The CPPA fails both tests for substantive neutrality: it expressly aims to curb a particular category of expression (child pornography) by singling out that type of expression based on its content and banning it. Blanket suppression of an entire type of speech is by its very nature a content-discriminating act.[5]

5. In contrast, the cases relied upon by the district court involved time, place and manner regu-

lations. See Ward v. Rock Against Racism, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)

Furthermore, Congress has not kept secret that one of its motivating reasons for enacting the CPPA was to counter the primary effect child pornography has on those who view it. *See* S. Rep. 104–358, at pt. III, IV(A) (reflecting congressional concern that a "child molester or pedophile [may use] the material to whet his sexual appetites," that child pornography "poisons the minds and spirits of our youth," and that, if shown to children, the material may "make children more susceptible of acceding to sexual demands of would-be abusers"); *see also id.* at pt. IV(B) (observing that "a major part of the threat to children posed by child pornography is its effect on the viewers of such material"). For these related reasons, the child pornography law is plainly activated by a "content-based classification of speech." *Ferber*, 458 U.S. at 763, 102 S.Ct. 3348.

Moreover, the statute makes no effort to permit alternative methods of disseminating or possessing the material in question. In this respect, the district court also erred in finding that adequate alternative avenues of expression exist. The CPPA is a quintessential content-specific statute, and therefore cannot be properly understood as a time, place or manner regulation.

■ But to say that the CPPA is content-based does not end the matter, for it is well-settled that child pornography, an unprotected category of expression identified by its content, may be freely regulated. We are asked to determine: first, whether the statute's definition of child pornography, expanded in an effort to outlaw computerized child pornography, satisfies the First Amendment; and second, assuming its sweep is appropriate, whether the law is adequately precise as to provide fair warning.

To resolve these issues, we start by reviewing the Supreme Court's pronouncements on the government's power to regulate child pornography. In *Ferber*, the Supreme Court first upheld the constitutionality of a state law proscribing the distribution of material depicting sexual performances by children under the age of 16. *See* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113. In doing so, it carved out an entire category of speech "which, like obscenity, is unprotected by the First Amendment." *Id.* at 764, 102 S.Ct. 3348. The Court likened child pornography to obscenity in that both kinds of expression may be banned, but explained that because of the state's "compelling interest in prosecuting those who promote the sexual exploitation of children," *see id.* at 761, 102 S.Ct. 3348, a law regulating child pornography need not adhere mechanistically to the three-part test for obscenity originally enunciated in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). One reason for allowing a departure from the obscenity rule and, as a result, somewhat greater authority to regulate child pornography is that "a work which ... contains serious literary, artistic, political, or scientific value may nevertheless embody the hardest core of child pornography." *Id.*

■ The *Ferber* Court did not establish a single one-size-fits-all constitutional definition of child pornography (as the Court arguably has done for obscenity), but provided general guiding principles. Ultimately, to pass constitutional muster, a particular anti-child pornography statute must be "adequately defined." 458 U.S. at 764, 102 S.Ct. 3348. In *Ferber*, the Court pointed out that New York's prohibition was confined to works that "*visually* depict sexual conduct by children below a specified age." *Id.* (Emphasis in original). It was also persuaded that the law's definition of sexual activity was "suitably limited and described." *Id.*

The Court further developed the contours of its child pornography jurisprudence in *Osborne v. Ohio*, 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990). There, the Court evaluated a state law prohibiting the possession and viewing of material depicting a nude minor "where such nudity constitutes a lewd exhibition or involves a graphic focus on the genitals." A defendant charged with unlawful possession attacked the statute as over-

(sound amplification guidelines); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (zoning ordinance restricting adult theaters to more than 1,000 feet from residential zones, dwellings, churches, parks, and schools); *Tollis, Inc. v. San Bernardino County*, 827 F.2d 1329 (9th Cir.1987) (similar zoning ordinance).

broad and vague. Rebuffing his twin challenges, the Court found that the statute was not aimed at controlling a person's private thoughts, but had been enacted to "protect victims of child pornography" and to "destroy[ ] a market for the exploitative use of children." 495 U.S. at 109, 110 S.Ct. 1691. The *Osborne* Court explicitly approved the following legislative goals: stamping out child pornography because it often serves as a record of abuse of real children; and denying pedophiles and would-be child abusers access to child pornography, which could be used to seduce or coerce children into sexual activity. *See id.* at 110–11, 110 S.Ct. 1691. The former remains intricately tied to the need to protect real children represented in the pictures, but the latter marks a subtle, yet crucial, extension of a state's legitimate interest to the protection of children not actually depicted in prohibited images.

As these cases demonstrate, the line between unprotected child pornography and otherwise protected expression (including possession of adult pornography, *see Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969)), is not entirely tangle-free. Nonetheless, four lessons can be drawn from the decisions.

■ First, sexually explicit material may be seen to fall along a constitutional continuum entitling it to varying degrees of protection. At one end of the spectrum, pictures of actual children in sexually compromising positions, deemed to have little or no social value, are entitled to no constitutional protection. At the opposite end of the spectrum, non-obscene images involving actual adults are entitled to full protection. Sexually explicit material created without the benefit of a live child model but which appears to depict an actual minor, or produced by having an adult pose as a minor and later presented or sold as if it depicted an actual minor, arguably falls somewhere in between.

■ Second, considerations beyond preventing the direct abuse of actual children can qualify as compelling government objectives where child pornography is concerned. When child pornography is the target, government is justified in not only driving it from the marketplace through aggressive anti-trafficking laws, but forbidding the private possession or personal viewing of these products altogether. *See Osborne*, 495 U.S. at 110, 110 S.Ct. 1691 (approving of state's efforts to "stamp out this vice at all levels in the distribution chain"). In this sense, concerns about how adults may use child pornography vis-a-vis children and how children might behave after viewing it legitimately inform legislators' collective decision to ban this material.

■ Third, in effecting such a prohibition, a criminal statute must cabin government authority by "adequately defin[ing]" the type of image that is to be forbidden. The cases require not only that the term "minor" be defined, but also that the type of condemned sexual depiction be carefully described.

■ Fourth, wherever the constitutional demarcation is to be properly drawn, "greater leeway" ought to be afforded legislatures to regulate sexual depictions of children. *Ferber*, 458 U.S. at 756, 102 S.Ct. 3348. The Court's instruction to federal courts to permit Congress slightly more room to operate in this area is bolstered by its view that "[t]he value of permitting . . . photographic reproductions of children engaged in lewd sexual conduct is exceedingly modest, if not *de minimis.*" *Id.* at 762, 102 S.Ct. 3348. As a result, some discretion has been given legislatures to set out the parameters of anti-pornography restrictions. For instance, the Court has repeatedly acknowledged that states have latitude to set the age at which an image is of a child rather than an adult. *See, e.g., United States v. X–Citement Video, Inc.,* 513 U.S. 64, 67, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994) (upholding federal law that employs 18 as age of majority); *Ferber,* 458 U.S. at 749, 102 S.Ct. 3348 (law set age of majority at 16). Congress and statehouses have some leeway in defining the kind of sexual depiction to be proscribed as well. *See X–Citement Video,* 513 U.S. at 78–79, 115 S.Ct. 464 (holding that it is constitutionally permissible to use either formulation— "lewd" or "lascivious" display of children's genitals).

With this analytic framework in mind, we turn to the task of assessing the constitutionality of the CPPA. The initial step is to ascertain the general scope of the statutory definition of child pornography, a task of pure statutory interpretation. Comparison of the law with prevailing constitutional precepts then follows.

## IV

We first evaluate the district court's conclusion that the CPPA is unconstitutionally overbroad. Overbroad statutes by their nature present a host of difficulties for our system of ordered liberty, not the least of which is a chilling effect on the communication of lawful ideas. But a statute will not be invalidated as overbroad unless its overbreadth is "real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Osborne*, 495 U.S. at 112, 110 S.Ct. 1691 (citation omitted). As the Court has admonished, the overbreadth doctrine is "strong medicine" that should be utilized "only as a last resort." *Ferber*, 458 U.S. at 769, 102 S.Ct. 3348 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)).

Judicial disinclination to employ the overbreadth doctrine is rooted in several important considerations. The first is an appreciation for the "wide-reaching effects of striking down a statute on its face." *Id.* Another related reason is that it may be inefficient to do so: facial invalidation is unwarranted if the likely number of lawful applications of the challenged statute far outstrips the few arguably problematic prosecutions under the law. It makes little sense to strike down an entire statute in response to a facial attack when potential difficulties can be remedied in future cases through fact-specific as-applied challenges. A third reason to hesitate before invoking the overbreadth doctrine is that doing so may be unwise. Deciding constitutional questions in the abstract is a recipe for making bad law. *See id.* at 781, 102 S.Ct. 3348 (Stevens, J., concurring) ("Hypothetical rulings are inherently treacherous and prone to lead us into unforeseen efforts; they are qualitatively less reliable than the products of case-by-case adjudication.").

The key question, then, is whether the CPPA poses substantial problems of overbreadth sufficient to justify overturning the judgment of the lawmaking branches. We conclude that it does not. We begin with the language of the statute. To the extent the CPPA criminalizes the possession, reproduction or distribution of a visual representation of an *actual* minor engaged in sexual conduct, it falls easily within the parameters established by *Ferber* and *Osborne*. The government's interests in deterring the direct abuse of children and destroying the illicit child pornography trade amply justify these steps, and the CPPA's methods of eradicating such images are appropriate.

Whether or not the prohibition of material that "appears to be" of a minor comports with the First Amendment is more troublesome. At first blush, potential problems threaten to doom the law. First and foremost, "appears" to whom? The statute itself is silent as to whether the test is meant to be objective or subjective or some combination of the two. On its face, the statute might also reach depictions with political, artistic, scientific, or educational value. If so, it is unclear whether that would be constitutionally permissible. And if, as Hilton and amici insist, the phrase "appears to be a minor" criminalizes possession of adult pornography created with models over the age of majority who look youthful, this too might pose additional constitutional difficulties.

A correct interpretation of the "appears to be a minor" standard and a full understanding of the interplay among the legal protections afforded an individual, we believe, puts the bulk of these concerns to rest. As to the breadth of the material covered by the statute, Congress's statements provide us with a precise and limited understanding of the "appears to be" language. We are obligated to follow it. "Where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *Almendarez–Torres v. United States*, 523 U.S. 224,

118 S.Ct. 1219, 1234, 140 L.Ed.2d 350 (1998) (Scalia, J., dissenting) (quoting *United States ex rel. Attorney General v. Delaware and Hudson Co.*, 213 U.S. 366, 408, 29 S.Ct. 527, 53 L.Ed. 836 (1909)); *see also Ferber*, 458 U.S. at 769 n. 24, 102 S.Ct. 3348 ("When a federal court is dealing with a federal statute challenged as overbroad, it should ... construe the statute to avoid constitutional problems, if the statute is subject to such a limiting construction."); *Veiga v. McGee*, 26 F.3d 1206, 1212 (1st Cir.1994) ("In the absence of clear legislative intent, we will not adopt an interpretation of a statute that would render it constitutionally suspect.").[6]

 We take our cue from the legislative record, which makes plain that the new language was intended to target only a narrow class of images—visual depictions "which are virtually indistinguishable to unsuspecting viewers from unretouched photographs of actual children engaging in identical sexual conduct." S. Rep. 104–358, at pt. I, IV(B). The Senate, in enacting S. 1237, explicitly stated that the "appears to be" language "applies to the same type of photographic images already prohibited, but which does not require the use of an actual minor in its production." *Id.* at pt. IV(C). The Senate clearly indicated that, by employing the phrase "appears to be," it was "extend[ing] [the prohibition against child pornography] from photographic depictions of actual minors engaging in sexually explicit conduct *to the identical type of depiction, one which is virtually indistinguishable from the banned photographic depiction,*" and no further. *Id.* (Emphasis added).

A few observations logically flow from this narrow construct. The primary one is that Congress meant only to extend federal authority in an important but limited fashion to a specific subset of visual images—those which are easily mistaken for that of real children.

It follows that drawings, cartoons, sculptures, and paintings depicting youthful persons in sexually explicit poses plainly lie beyond the reach of the Act.[7] By definition, they would not be "virtually indistinguishable" from an image of an actual minor. The CPPA therefore does not pose a threat to the vast majority of every day artistic expression, even to speech involving sexual themes.

Hilton (and assorted amici) nevertheless insist that the First Amendment allows regulation of sexually explicit material only where actual children are abused in its creation. They also contend that the statute is impermissibly expansive because it is very difficult to determine whether a person looks 17 or 18; they believe that the statute is bound to criminalize possession of protected adult pornography.

 Their first argument amounts to an effort to draw a bright line in an area of law in which courts have resisted creating clearcut categories. Relying on *Ferber*'s discussion of the importance of protecting children from sexual exploitation, they argue that the Supreme Court has strictly limited regulation of child pornography to images manufactured with the use of live children. But we find no firm basis for this overly restrictive reading of precedent. We do not read the cases to say that Congress has power to remedy only the abuse of children during the process used to produce traditional forms of child pornography. While the Court certainly has been concerned with the "surpassing importance" of protecting the actual abuse of children who appear in pornographic material, it has not limited the government's authority to achieving that objective, and that objective alone. *Ferber*, 458 U.S. at 757, 102 S.Ct. 3348. Rather, it has mandated that government be permitted a certain degree of flexi-

---

**6.** This maxim of statutory interpretation is grounded in a desire to avoid premature adjudication of constitutional issues and reflects a presumption that Congress, in enacting the law, "would intend to err on the side of fundamental constitutional liberties when its legislation implicates those liberties." *Regan v. Time, Inc.*, 468 U.S. 641, 697, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984).

**7.** The government concedes this point in a different way: that such drawings or paintings would not be a visual depiction of a "person." We make no judgment about the correctness of the government's interpretation of the term "person."

bility in how it chooses to grapple with new problems presented by the evolving nature of the child pornography industry. *See Osborne*, 495 U.S. at 110, 110 S.Ct. 1691. The cases do suggest, however, that an appropriate set of governmental goals (and the government's methods of fulfilling those goals) should be reasonably related to the primary aim of "safeguarding the physical and psychological well-being" of children, and, by extension, crippling the clandestine child pornography trade. *Id.* at 109, 110 S.Ct. 1691 (citation omitted).

The laws in force when the Court decided *Ferber* and *Osborne* uniformly defined child pornography by focusing on material involving the use of actual children. The Court in those cases used, for purposes of its constitutional discussion, the statutory definition of child pornography then before it. The legal issues presented in this case, including Congress's justifications offered for extending child pornography statutes to stem the flow of virtual child pornography, have not been analyzed by this, or any other, court of appeals.[8]

We think that it is a logical and permissible extension of the rationales in *Ferber* and *Osborne* to allow the regulation of sexual materials that appear to be of children but did not, in fact, involve the use of live children in their production. Like sexually explicit material produced with actual children, there is little, if any, social value in this type of expression. In constitutional terms, sexually explicit material produced without the benefit of a live child model but giving the appearance as if it had been is more akin to traditionally unprotected child pornography than adult pornography. The same is true of material created by having a youthful-looking adult pose as a minor that is sold or presented as though it contained a pornographic image of an actual minor. Such depictions can be readily used so as to further the child pornography trade or to facilitate the abuse of children.

The government's interest in safeguarding the welfare of children is compelling in these situations. Computer-created or enhanced material can be bought, sold, or traded like any other form of child pornography, adding further fuel to the underground child pornography industry. It can be used just as effectively as pictures of actual children to entice or blackmail children into cooperating with would-be abusers. Moreover, the material may have been created through the abuse of an actual minor but altered so that it may be impossible to show that a real child was ever involved in its creation. As technology improves and access to technology increases, efforts to eradicate the child pornography industry could be effectively frustrated if Congress were prevented from targeting sexually explicit material that "appears to be" of real children. The government's interest in addressing these forms of child pornography is no less powerful than in instances where an actual child is actually used and abused during the production process. We will not second-guess Congress's decision to address the social ills posed by the various types of virtual child pornography.

Hilton's and amici's next objection also misses the mark. They maintain that the inherent difficulty of determining whether a depicted person "appears to be" 17 or 18 renders the definition overly broad. They fear that persons will be convicted of possessing sexually explicit material of adults who look or dress in a youthful manner. We think this danger is overstated. The main flaw in the argument is its inordinate focus on the arguably fuzzy line between age 17 and 18, a line which, as with many laws, must be drawn somewhere. More importantly, we are satisfied that the vast majority of prosecutions under the "appears to be a minor" provision would involve images of pre-pubescent children or persons who otherwise clearly appear to be under the age of 18. Congress, relying on the opinion of experts, has determined that purveyors of child pornography usually cater to pedophiles, who by definition have a predilection for pre-pubertal children. *See* S. Rep. 104–358, at § 2, pts. IV(A), (C). The apparent age of a pre-pu-

---

**8.** *The Free Speech Coalition v. Reno*, 1997 WL 487758 (N.D.Cal. Aug. 12, 1997), in which a federal district court upheld the CPPA against a

defendant's overbreadth and vagueness challenges, has been appealed to the Ninth Circuit, but the court has not yet rendered a decision.

bescent child can easily be established through objective proof. While it is theoretically possible that there may be prosecutions of individuals selling or possessing images of youthful-looking adults, it is unlikely that they would comprise a substantial proportion of the prosecutions under the statute.

The existence of a few possibly impermissible applications of the Act does not warrant its condemnation. As the Court has repeatedly made plain, even if a statute at its margins infringes on protected activity, the solution is not invalidation of the entire scheme. *See Frisby v. Schultz,* 487 U.S. 474, 488, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (declining to evaluate all "hypothetical applications" of ordinance in resolving facial challenge). Whatever overbreadth may exist at the edges are more appropriately cured through a more precise case-by-case evaluation of the facts in a given case. *See New York State Club Assoc., Inc. v. City of New York,* 487 U.S. 1, 14, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988).

We recognize that the Court has said that adult models may be employed under certain circumstances to simulate minors posing in a sexually provocative manner for serious artistic, educational, or scientific purposes. Indeed, in *Ferber,* the Court observed that "if it were necessary for literary or artistic value, a person over the statutory age who perhaps looked younger could be utilized." 458 U.S. at 763, 102 S.Ct. 3348; *see also X–Citement Video,* 513 U.S. at 72, 115 S.Ct. 464 ("[N]on-obscene, sexually explicit materials involving persons over the age of 17 are protected by the First Amendment.").

■ Take, for example, a film version of Nabokov's *Lolita.* A director might legitimately wish to employ a youthful-looking adult to portray, in a non-obscene manner, a sexual encounter between Lolita and Humbert. Similarly, use of an adult model to simulate the sexual behavior of a child might be necessary for scientific research. The social value of these works obviously could not be shrugged off as de minimis. They would be far from the "hardest core of child pornography." *Ferber,* 458 U.S. at 761, 102 S.Ct. 3348. The First Amendment interest in permitting dissemination of such material

would be sufficiently strong to warrant its protection. At the same time, the government's countervailing interest in protecting children "is likely to be far less compelling" when "the depiction is a serious contribution to art or science." *Id.* at 776, 102 S.Ct. 3348 (Brennan, J., concurring). Should the government decide to prosecute someone for distributing or possessing such material, we believe there would be an affirmative First Amendment defense available to the accused, although we need not define now its precise dimensions. Recognizing such a defense is consistent with Congress's general view that the law generally "does not, and is not intended to, apply to a depiction produced using adults engaging in sexually explicit conduct, even where a depicted individual may appear to be a minor." S. Rep. 104–358, at pt. IV(C). It is also consonant with the Court's teachings in *Ferber,* where the Court assumed that even if in some rare instance the depiction of children performing sexual acts might be necessary for literary or artistic reasons, "a person over the statutory age who perhaps looked younger could be utilized." 458 U.S. at 763, 102 S.Ct. 3348.

■ We need not fully explore the details of this exception today. Suffice it to say that the existence of a tiny fraction of material that could conceivably qualify for heightened protection but might nevertheless fall within the purview of the Act (*i.e.,* where youthful adults pose as children for sexually provocative images with redeeming social value) does not render the statute as a whole substantially overbroad. The appropriate remedy is reversal of an unconstitutional conviction should the circumstance arise, not invalidation of the statute *in toto* at this stage.

Once the phrase "appears to be a minor" is properly understood, the constitutional barriers fall away. The fear of a chilling effect on protected speech subsides. We conclude, therefore, that the CPPA is not unconstitutionally overbroad.

### V

We next consider whether the district court erred in holding the CPPA unconstitutionally vague. The touchstone of our sys-

tem of justice is the right to fair warning of criminal charges. An ambiguous law fails to provide the requisite notice and undermines public confidence that the laws are equally enforced.

The standard for overturning a law on vagueness grounds is a stringent one. A statute will not be held void for vagueness unless it fails to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary or discriminatory enforcement." *Kolender*, 461 U.S. at 357, 103 S.Ct. 1855; *see also United States v. Bohai Trading Co.*, 45 F.3d 577, 580 (1st Cir.1995) (proper inquiry is whether statute "provide[s] a constitutionally adequate warning to those whose activities are governed") (citation omitted). When a law directly impinges on freedom of expression, as the CPPA does here, we must scrutinize the law with an even more skeptical eye. We are obliged do so because the threat of severe criminal sanctions and the full force of social stigma, coupled with uncertain notice of criminal liability offered by a poorly-worded statute, "may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." *Reno v. ACLU*, 521 U.S. at ——, 117 S.Ct. at 2345.

The district court found the CPPA unduly vague because it believed the "appears to be a minor" standard to be purely subjective in nature. To the contrary, we hold that the standard is an objective one. A jury must decide, based on the totality of the circumstances, whether a reasonable unsuspecting viewer would consider the depiction to be of an actual individual under the age of 18 engaged in sexual activity. *See* S. Rep. 104–358, at pt. IV(C).

Without limiting *a priori* the type of evidence that would be admissible on this question in a given case, the following proof could be offered to establish the apparent age of the person shown: the physical characteristics of the person; expert testimony as to the physical development of the depicted person; how the disk, file, or video was labeled or marked by the creator or the distributor of the image, or the defendant himself, *see, e.g., United States v. Robinson*, 137 F.3d 652, 652 (1st Cir.1998) (photographs labeled by names, dates taken, and ages of boys depicted); and the manner in which the image was described, displayed, or advertised. While this list is hardly exhaustive, it gives a flavor of the ways in which a depicted person's apparent age might be objectively proven.

The element of scienter also must be satisfied by the prosecution before a valid conviction may be obtained—for instance, the government must prove beyond a reasonable doubt that an individual "knowingly" possessed the child pornography. *See* 18 U.S.C. § 2252A(a)(5)(B). This statutory requirement serves as an additional safeguard, for the government must show not only that the individual purposefully acquired or distributed the material, but that he did so believing that the material was sexually explicit in nature and that it depicted a person who appeared to him to be (or that he anticipated would be) under 18 years old. *See X–Citement Video, Inc.*, 513 U.S. at 78, 115 S.Ct. 464 (holding that scienter requirement in related anti-child pornography statute "extends to both the sexually explicit nature of the material and to the age of the performers").

The CPPA offers an added measure of protection. It provides an affirmative defense if the person depicted actually was an adult at the time the image was created. When the defense is appropriate, the fact that the person depicted was a live model at least 18 years of age typically will lead to dismissal of the charge. Although Congress did not make the affirmative defense available to someone accused of unlawful possession (as opposed to any of the other offenses such as distribution), what an individual actually believed to be the age of the depicted person still goes to his state of mind in possessing the material. Thus, a defendant who honestly believes that the individual depicted in the image appears to be 18 years old or older (and is believed by a jury), or who can show that he knew the image was created by having a youthful-looking adult pose for it, must be acquitted, so long as the

image was not presented or marketed as if it contained a real minor.[9]

We believe, in short, that the statute's provisions "suitably limit" the reach of the Act so that a person of ordinary intelligence can easily discern likely unlawful conduct and conform his or her conduct appropriately. The statute carefully defines the term "minor." The scope of its prohibition, like the law evaluated in *Ferber*, is restricted to visual images. The statute describes, in painstaking detail, the types of sexually explicit depictions of children that are forbidden. As the Court said in *Osborne*, such limiting language "avoid[s] penalizing persons for viewing or possessing innocuous photographs of naked children." 495 U.S. at 114, 110 S.Ct. 1691.

We disagree with the district court's assumption that the use of a legal standard requiring an evaluation of the appearance of an image renders the test arbitrary or overly susceptible to manipulation. Reasonable objective assessments of the impression conveyed by a person's actions or how an image "appears" are routinely made by judges and juries. *See, e.g., Liteky v. United States,* 510 U.S. 540, 553 n. 2, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) (noting that recusal motions under 28 U.S.C. § 455(a) are governed by *"objective appearance* of partiality" test); *Ferber,* 458 U.S. at 751, 102 S.Ct. 3348 (approved definition of child pornography banned "simulated" sexual conduct, which in ordinary usage means "to have or take on the appearance of"); *Miller,* 413 U.S. at 24, 93 S.Ct. 2607 (obscenity depends in part on whether material appeals to prurient interest of average person).

Yet Hilton returns to a familiar refrain: that it is terribly difficult to distinguish between an apparent 17 year old and an apparent 18 year old. This problem, he argues, renders the statute unduly vague (as well as overbroad). We think not. As discussed earlier, any number of objective signs should be enough to warn an ordinary viewer of sexually explicit material of the apparent age of the person depicted, including his or her

physical characteristics and how the image is labeled or marketed. And those involved in the production of lawful sexually explicit material can easily protect themselves by verifying the ages of the models they employ or by taking steps to visually demonstrate that a computer-generated image is meant to portray an adult.

There is another reason why Hilton's vagueness challenge fails: there are few equally efficacious alternatives. At oral argument, defense counsel suggested that a better approach would be to prohibit images of persons who are or appear to be "physically sexually immature." Such a test, had Congress selected it, might very well have been more precise than the one Congress chose to adopt, which turns on the age or apparent age of the person depicted. It is often said that because we are "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rockford,* 408 U.S. 104, 109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). That lesson applies here.

■ But even if the proffered standard were more exact, there would still be a more fundamental problem—it would fail to reach a whole category of persons Congress intended to protect, namely, those youngsters who appear "physically sexually mature" but are under the age of consent. We reject the suggestion that Congress must be confined to addressing pornographic images of some children, but not others. Firmly satisfied that it is well within Congress's power to regulate virtual pornography of minors of all ages (infancy through age of majority as set by the legislature), we are aware of few other linguistic approaches that would achieve the same goals. Defendant's proposal does not fit the bill. The "appears to be a minor" test, by comparison, is sufficiently precise to pass constitutional muster and yet flexible enough to meet the challenges posed by computerized child pornography.

We see no reason to strike down the CPPA as unconstitutionally vague. The lan-

9. The government need not prove that a defendant was aware of the jurisdiction-conferring fact that the material in question was actually transported in interstate commerce. *See Robinson,* 137 F.3d at 655.

guage of the statute affords an ordinary consumer of sexually explicit material adequate notice of the kinds of images to avoid. The interaction among the applicable legal standards, moreover, offers the average person additional protection. These safeguards, working in concert, minimize the danger that this law might be enforced in an arbitrary or discriminatory fashion by overzealous police officers or prosecutors.

The judgment of the district court is *reversed*.