**RHODE ISLAND MEDICAL SOCIETY, Pablo Rodriguez, M.D., Benjamin S. Vogel, M.D., and Planned Parenthood of Rhode Island, Plaintiffs,**

**v.**

**Sheldon WHITEHOUSE, Attorney General of the State of Rhode Island, in his official capacity, Defendant,**

**and**

**Lincoln Almond, Governor of the State of Rhode Island, in his official capacity, Defendant—Intervenor.**

**No. C.A. 97–416L.**

United States District Court, D. Rhode Island.

Aug. 30, 1999.

Lynette J. Labinger, Roney & Labinger, Providence, RI, Catherine Weiss, Louise Melling, Caitlin Borgmann, Talcott Camp, ACLU Foundation, New York City, for plaintiffs.

Rebecca Tedford Parington, Attorney General's Office, Providence, RI, Claire

J.V. Richards, Office of the Governor, Providence, RI, for defendant.

### DECISION AND ORDER

LAGUEUX, Chief Judge.

Attorney General Sheldon Whitehouse and Governor Lincoln Almond ("defendants") undertake a Herculean effort to save Rhode Island's ban on partial birth abortions, R.I.Gen.Laws § 23–4.12 (1996) (the "Act"). Two years ago, this Court opined that the Act appeared presumptively unconstitutional, even with all presumptions applied in favor of the law. That proved true.

The Act sprouted amid a national debate about a relatively-new surgical procedure described below as a "D & X." When the Act first passed in 1997, the Rhode Island General Assembly (the "Legislature") was tilling soil already occupied by nearly three decades of abortion jurisprudence. Almost immediately, this case was filed, and this Court predicted that constitutional pruning would be necessary. Thus in 1998, the Legislature transplanted language from a Congressional bill in the hopes of escaping the shears. That amended Act is under review here.

At trial, defendants argued that the term "partial birth abortion" refers only to the D & X procedure. Doctors accept a definition of the D & X, and defendants claim that the Legislature trussed the Act to a limited trellis and banned that single procedure. However, the reality is that the Legislature rejected the medical exegesis. The Act defines "partial birth abortion" with completely different words and encompasses a completely different set of operations. As such, the Act's canopy stretches to overshadow constitutionally-protected abortions. Obstetricians Pablo Rodriguez and Benjamin Vogel, along with Planned Parenthood of Rhode Island and the Rhode Island Medical Society (collectively "plaintiffs"), have demonstrated multiple flaws in the Act—two provisions that strangle constitutional rights and two missing exceptions required by the United States Supreme Court.

Put simply, the Legislature did not write into law what defendants now claim that it intended. No reasonable reading of the Act matches what defendants see there. This is a nation of laws, not of legislative history or attorney general advisory opinions. No amount of government promises can salvage this Act. This case does not decide whether defendants may proscribe the D & X because this Act bans far more and, not coincidentally, far more than the Constitution allows. The Supreme Court instructs that a law this unrestrained and pernicious to the Constitution must be torn out by the roots.[1]

As explained below, the Act violates the Constitution for four distinct reasons. Because of the likelihood of legislative amendments, this Court seeks to be perfectly clear where the Act grows into a protected plot. First, the entire Act is unconstitutional because the definition of "partial birth abortion" is vague and infringes on the D & E procedure which is legally protected. Second, the entire Act is unconstitutional because it lacks an exception for the mother's health. Third,

---

1. Abortion is protected, but it is still brutal. Over four days, this Court heard graphic descriptions of abortion procedures and complications that accompany them. In testimony, the doctors used medical language. Some of these terms are employed for their precision, but often they are merely bloodless substitution for common words. This Court will not offer the Disney version of this dispute. Therefore, this Court adopts common terms where appropriate, including:

- "fetus" for the offspring of human beings before birth, otherwise described as "embryo," "pregnancy" or "child"
- "dilate" for "dilitate"
- "dismember" for "disarticulate"
- "brain" for "intercranial contents"
- "D & X" for the procedure defined in Section II(A)(1)(e), *infra*, otherwise described as "intact D & E" or "dilation and extraction"
- "vacuum aspiration" for "suction curettage"

the entire Act is unconstitutional because the "mother's life" exception is inadequate. Fourth, the civil remedies are unconstitutional because they place an undue burden on a woman's right to an abortion.

This Court declines to reach plaintiffs' "legitimate state interest" argument, which affects equal protection and substantive due process. These arguments would be relevant if the Legislature were to replace the Act's definition with the detailed, medically-accepted D & X definition. That, however, would be a different case and controversy.

Therefore, this Court issues a permanent injunction against the enforcement of R.I.Gen.Laws § 23–4.12. This Act violates the Constitution and 42 U.S.C. § 1983. Plaintiffs are also entitled to attorneys' fees and costs.

## FACTS

### I. *Parties*

Drs. Rodriguez and Vogel are physicians who perform abortions in Rhode Island. Planned Parenthood is a Rhode Island corporation that hires doctors to perform abortions at its facility. The Rhode Island Medical Society (the "Medical Society") is an association of doctors. The defendants are the Attorney General and Governor of Rhode Island.

### II. *Abortion Practice*

■ Pursuant to Federal Rule of Civil Procedure 52(a), this Court may enter judgment following a trial without a jury. *See* Fed.R.Civ.P. 52(a). In crafting a decision following a bench trial, the Court "shall find the facts specially and state separately its conclusions of law thereon." *Id.* It is within the purview of the trial court to weigh the credibility of witnesses for the purpose of making findings of fact. *See id.* This Court draws its factual evidence from a bench trial conducted May 3–6, 1999. The medical facts depend primarily on the testimony of three doctors who were certified as experts in abortion practice: plaintiff Rodriguez of Women & Infants Hospital, (*see* P.s' Ex. 6 (resume)); plaintiffs' witness Phillip Stubblefield of Boston Medical Center, (*see* P.s' Ex. 8 (resume)); and defendants' witness Frank Boehm of Vanderbilt University Hospital, (*see* D.s' Ex. J (resume)).

### A. *Abortion Procedures*

■ An abortion occurs any time that a pregnancy ends without a viable baby being born. The Act concerns itself only with induced, rather than natural, abortions, so the parties in this case use the term "abortion" without modification.

Doctors separate abortion procedures into six distinct types defined below. The procedures are performed at different stages of pregnancy and are accompanied by different risks and complications. The age of a fetus is measured in weeks, counting backwards to the first day of the woman's most-recent menstrual period.

One of the procedures—the D & X—is relatively new, and several courts have differed on whether it is distinct from the established procedure known as the D & E. However, the evidence in this case is clear that, even if there was confusion several years ago, the dust has settled. Based heavily on a 1997 definition by the American College of Obstetricians and Gynecologists ("ACOG"), doctors recognize the difference between the D & E and the D & X.

As an aside necessary to defining the words in the Act, this Court recognizes that doctors use the term "procedure" in a particularly diffuse fashion. It seems that any distinct action by a doctor can be defined as a procedure. Thus, the abortion operation is a procedure, and it is made up of components that are also procedures, such as injecting anesthesia, cutting an incision through a woman's abdomen, or scraping the uterine wall. Those, in turn, are made of up even more-basic and discrete procedures. Based on the testimony at this trial, this Court finds any

distinct action can be medically defined as a procedure, but that doctors define only some actions as "procedures." Apparently, an action—much like esteemed people—must have some recognized significance to qualify for a title.

1. *Types of abortions*

a. *Vacuum aspiration*

In a vacuum aspiration abortion, the physician dilates the cervix and then removes the fetus and the other products of conception with a tube or syringe that is inserted into the uterus. This is the procedure that carries the least risk to the woman, and it is the most-common type of abortion during the first 12 weeks of pregnancy.

The fetus can pass through the suction tube (called a "cannula") either intact or dismembered. While dismembered parts of the fetus are suctioned out of the uterus, part of the fetus remains in utero and may have a heartbeat. The vacuum aspiration becomes impossible when the fetus grows too large for the available tubes, typically after the first trimester.

Dr. Stubblefield and Dr. Rodriguez described instances in which portions of the fetus jam the suction tube. In that situation, the physician must remove the tube from the patient's body and clear the tube. The fetal tissue thereby passes through the vagina as the doctor removes the tube. The doctor then returns the tube to the uterus and continues the abortion.

b. *D & E*

In a D & E, the physician dilates the cervix and uses a combination of suction and traction to dismember the fetus inside the woman's body. The pieces are pulled out of the uterus through the vagina, generally with forceps. The D & E, also known as dilation and extraction, is the most-common technique used between 12 and 23 weeks.

The physician generally dilates the cervix with dilators that can be mechanical or osmotic, those which absorb moisture and expand slowly in the cervix. Once the cervix is open sufficiently and the dilators are removed, the doctor reaches into the uterus with an instrument and ruptures the amniotic sac. Then, using a combination of suction curettage and forceps, the physician removes the fetus. Normally, the fetus is removed in parts. The physician pulls on fetal body parts until the portion slides into the vagina and the remainder of the body jams against the cervix. The doctor tries to pull as much of the fetus as possible. Traction tears apart the fetus' body.

Theoretically, a D & E is possible until the fetus becomes viable. However, the fetus' bones become stronger as weeks pass, and the D & E becomes more and more difficult. Generally, this procedure may be performed until about 23 weeks.

At times, the physician can remove the fetus intact. This occurs when the cervix has dilated enough to allow the entire body to pass through intact. This is an unintended consequence and not the standard procedure for a D & E. Dr. Rodriguez described the rare event when the body will be delivered up to the head, which jams at the cervix because it is generally larger than the body. He said that the skull must be crushed for the head to pass.

The specific procedures in a D & E depend on a number of variables including the size and orientation of the fetus, the amount of dilation, the condition of the cervix and uterus, and the patient's overall health and medical condition.

c. *Induction*

In an induction, the physician induces premature labor by administering medications, including prostaglandin, saline or urea. The fetus is born, and because it is not old enough to survive outside the womb, it dies either during labor or within minutes of birth. These procedures are performed in a hospital or hospital-like setting, as opposed to a doctor's office or

less-prepared clinic. Inductions generally are not performed before 16 weeks because, prior to that point, the uterus is less responsive to labor-inducing medications. From 16 to 20 weeks, they are commonly done with prostaglandin and after 20 weeks with saline. They can be performed until viability.

Sometimes a separate procedure is necessary to remove the placenta and other remaining products of conception. Dr. Stubblefield described a rare complication, similar to the rare D & E complication described above, in which the mother's cervix dilates enough that the fetus' body passes into the vagina but the head jams at the internal os, the edge of the uterus where it meets the vagina. Even if the fetus is alive at this point, it is destined to die. However, that could come about in at least three ways: the doctor may inject poison into the fetus' heart; the doctor might crush the skull; or the doctor could wait for the fetus' blood supply to be strangled as the umbilical cord is compressed between the skull and the uterine wall.

d. *Hysterectomy and hysterotomy*

A hysterotomy is essentially a pre-term caesarian section. The physician makes an incision in the uterine wall and removes the fetus through the abdomen. Hysterectomy is the removal of the uterus as well as the fetus, and it renders the woman sterile. These are much less common than years ago because they have been supplanted by newer techniques with fewer risks to the mother's health and life. Only 44 hysterectomies and hysterotomies were reported nationwide in 1995 as a means of performing an abortion. (*See* P.s' Ex. 4 at Table 18.)

e. *D & X*

In the past decade, physicians have publicized the D & X, a variation of the D & E that they perform in later term abortions, generally after the 24th week. In the D & X, the physician extracts the fetus intact, feet first, until the cervix is obstructed by the fetal skull. The skull is crushed either with forceps or by inserting a sharp instrument at the base of the fetal skull and evacuating the brain. This procedure is also called the "intact D & E," "intact dilatation and extraction" or the "partial birth abortion." This Court uses the term D & X for simplicity's sake.

This procedure was first publicized by Dr. Martin Haskell in 1992 in a paper that he delivered at a convention. (*See* D.s' Ex. A.) Other courts have found that doctors could not distinguish between a D & E and a D & X. However, all witnesses in this case recognized the distinct procedure based on descriptions offered by Dr. Haskell and Dr. James McMahon, (*see* D.s' Ex. B), and based on a definition written by the executive board of ACOG in 1997. ACOG defined the D & X as having all four of the following elements:

1. deliberate dilatation of the cervix, usually over a sequence of days;

2. instrumental conversion of the fetus to a footling breach;

3. breech extraction of the body excepting the head;

4. partial evacuation of the intracranial contents of a living fetus to effect vaginal delivery of a dead but otherwise intact fetus.

(D.s' Ex. D [*hereinafter* the "ACOG definition"].)

As will become clear below, it is crucial to emphasize that Drs. Rodriguez, Stubblefield and Boehm relied on the ACOG definition to delineate the D & X. This Court finds that the ACOG definition created a common ground that doctors understand. The ACOG definition is the medically-accepted definition of D & X, and this Court uses D & X to refer to the ACOG-defined operation. Still, the D & X is a variant of the D & E. Any and all of the steps that occur during the D & X can occur during a D & E. The D & X is merely a subset, a defined group of procedures that would have been called a D & E

until doctors and medical groups carved it out.

### 2. *Risks of different procedures*

Generally, the risk to a woman's health or life created by an abortion increases with the number of weeks of the pregnancy. A vacuum aspiration carries less risk than a D & E, which carries less risk than an induction, which carries less risk than a hysterotomy or hysterectomy. Doctors have not done statistical studies as to the relative risk of a D & X, although the doctors testified that it was equal to or less than the risk of a D & E. The complications related to abortions can range from short-term fevers or bleeding to long-term inability to carry future babies to term to life-threatening endometritis or hemorrhage.

The D & E procedure is particularly important for women whose fetuses have genetic or congenital anomalies. Some of these anomalies are fatal within days, or even minutes, of birth. Because most fetal anomalies cannot be detected before the 16th to 18th week and the results of these tests take two to four weeks, D & E procedures are extremely important because they can be used to terminate these pregnancies safely.

### B. *Abortions in Rhode Island*

### 1. *Doctors' intent on beginning operations*

When a doctor walks into an operating room to perform an abortion, he or she intends to perform one of the six abortion types described above. Doctors understand the differences, and they give evidence of their choice both through the consent forms that patients sign and through notes or hospital forms that the doctor signs.

Complications during the abortion—some rare, some common—may cause a doctor to change the procedure that he or she is performing. For example, extreme emergency may cause a doctor to under-take a hysterectomy or hysterotomy even though the initial intent had been to conduct an induction.

### 2. *Abortions by Rhode Island doctors*

In 1995, Rhode Island doctors performed 5,707 abortions. (*See* P.s' Ex. 4 at Table 8.) No doctor performs the D & X in Rhode Island. No evidence was offered that a D & X has ever been performed in the state.

Planned Parenthood only offers vacuum aspirations. Inductions are only performed in Rhode Island at Women & Infants Hospital in Providence. Some late-term procedures are not done at all in Rhode Island, so patients are sent out of state, often to Boston.

### III. *The Act*

The Act's language was drawn from a bill that Congress passed but President Clinton vetoed. *See* H.R. 1122, 105th Cong. (1997) (the language); D.s' Ex. BB (Governor Almond noting the similarity in language).

### A. *The Language*

The Act, after the 1998 amendments, includes the language at issue in this case:

**23–4.12–1 Definitions.**

(a) Partial birth abortion. For purposes of this chapter, "partial birth abortion" means an abortion in which the person performing the abortion vaginally delivers a living human fetus before killing the infant and completing the delivery.

(b) Fetus and infant. For purposes of this chapter, the terms "fetus" and "infant" are used interchangeably to refer to the biological offspring of human parents.

(c) As used in this section, the term "vaginally delivers a living fetus before killing the infant" means deliberately and intentionally *delivers into the vagina a living fetus, or a substantial portion thereof,* for the purpose of performing a procedure the person performing

the abortion knows will kill the infant, and kills the infant.

### 23–4.12–2 Prohibition of partial birth abortions.

No person shall knowingly perform a partial birth abortion.

### 23–4.12–3 Life of the mother exception.

Section 23–4.12–2 shall not apply to a partial birth abortion that is necessary to save the life of a mother because her life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering condition caused by or arising from the pregnancy itself; provided, that no other medical procedure would suffice for that purpose.

### 23–4.12–4 Civil remedies.

(a) The woman upon whom a partial birth abortion has been performed in violation of § 23–4.12–2, the father of the fetus or infant, and the maternal grandparents of the fetus or infant, and the maternal grandparents of the fetus or infant if the mother has not attained the age of eighteen (18) years at the time of the abortion, may obtain appropriate relief in a civil action, unless the pregnancy resulted from the plaintiff's criminal conduct or the plaintiff consented to the abortion.

(b) Such relief shall include:

(i) Money damages for all injuries, psychological and physical occasioned by the violation of this chapter; and

(ii) Statutory damages equal to three (3) times the cost of the partial birth abortion.

(c) If judgment is rendered in favor of the plaintiff in an action described in this section, the court shall also render judgment for a reasonable attorney's fee in favor of the plaintiff against the defendant. If the judgment is rendered in favor of the defendant and the court finds that the plaintiff's suit was frivolous and brought in bad faith, the court shall also render judgment for a reason-able attorney's fee in favor of the defendant against the plaintiff.

### 23–4.12–5 Penalty.

(a) Performance of a partial birth abortion deliberately and intentionally is a violation of this chapter and shall be a felony.

(b) A woman upon whom a partial birth abortion is performed may not be prosecuted under this chapter for violating this chapter, or any provision thereof, or for conspiracy to violate this chapter or any provision thereof.

### 23–4.12–6 Severability.

(a) If any one (1) or more provisions, clauses, phrases, or words of § 23–4.12–3 or the application thereof to any person or circumstance is found to be unconstitutional, the same is hereby declared to be inseverable.

(b) If any one (1) or more provisions, sections, subsections, sentences, clauses, phrases or words of the remaining sections or the application thereof to any person or circumstance is found to be unconstitutional, the same are hereby declared to be severable and the balance of the chapter shall remain effective notwithstanding such unconstitutionality. The legislature hereby declares that it would have passed this chapter, and each provision, section, subsection, sentence, clause, phrase, or word thereto, with the exception of § 23–4.12–3, irrespective of the fact that any one (1) or more provisions, sections, subsections, sentences, clauses, phrases, or words be declared unconstitutional.

R.I. Gen.Laws § 23–4.12 (emphasis added).

### B. *History of the Legislation*

On July 2, 1997, Governor Almond signed the first bill passed by the Legislature to ban partial birth abortions. This Court issued a temporary restraining order against enforcement of the Act on July

11, 1997.[2] The case was later stayed to allow the Legislature to amend the Act, and in July 1998, Governor Almond signed a bill that responded to this Court's comments. That amendment created the Act at issue in this case.

The legislative history entered into evidence in this case suggests that neither Governor Almond nor the legislative sponsors lobbied for the Act to ban all abortions. When legislators raised the possibility during the debate, Rep. Frank Anzeveno said that he wished that it would ban all abortions, but he said he did not think it reached so far. (*See* D.s' Ex. AA at 6, ln. 15–16.) Governor Almond emphasized his limited intent in both of his transmission messages when he signed the bills. (*See, e.g.,* D.s' Ex. BB & CC.) Many supporters mentioned "a procedure" or similar language that suggests that they were offended by and hoped to ban a single procedure. (*See, e.g.,* D.s' Ex. AA at 2, ln. 19–21 (Rep. Anzeveno offering to describe a partial birth abortion).) But there is no definitive evidence of how the Legislature defined that procedure other than the Act's language. (*See* D.s' Ex. AA at 7, ln. 11–12 (Rep. Anzeveno declining to explain the procedure that would be banned: "Part of the baby is delivered. Part is not.").)

## ISSUES OF LAW

IV. *Overview of Supreme Court's Abortion Jurisprudence*

 A woman's right to an abortion before the fetus is viable is guaranteed by the Due Process Clause of the Fourteenth Amendment. *See Planned Parenthood v. Casey,* 505 U.S. 833, 846, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); *Roe v. Wade,* 410 U.S. 113, 153, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

 The Sixth Circuit neatly summarized the Supreme Court's jurisprudence on two settled principles:

(1) states may ban a particular abortion procedure pre-viability as long as the regulation does not create an undue burden on a woman's right to choose an abortion; and

(2) subsequent to viability, states may regulate and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.

*See Women's Med. Prof'l Corp. v. Voinovich,* 130 F.3d 187, 193 (6th Cir.1997) (quoting *Casey,* 505 U.S. at 879, 112 S.Ct. 2791). The Supreme Court plurality explained that "[a] finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a non-viable fetus." *Casey,* 505 U.S. at 877, 112 S.Ct. 2791. This "undue burden" standard is the central focus of the Court's analysis.

At least four district courts have examined other state laws with language that parallels the Act. All four reported opinions found that language drawn from the federal bill violated the Constitution. *See Richmond Med. Ctr. v. Gilmore,* 55 F.Supp.2d 441 (E.D.Va. 1999), *appeal docketed,* Nos. 98–1930 & 99–2000 (4th Cir. July 29, 1999); *Planned Parenthood v. Miller,* 30 F.Supp.2d 1157 (S.D.Iowa 1998), *appeal submitted on briefs,* No. 99–1372 (8th Cir. July 1, 1999); *Planned Parenthood v. Verniero,* 41 F.Supp.2d 478 (D.N.J. 1998), *appeal docketed,* No. 99–5042 (3d Cir. Jan 28, 1999); *Eubanks v. Stengel,* 28

---

**2.** A TRO has been in effect consistently since July 1997 and only ceases to exist because it is replaced by a permanent injunction as a result of this opinion. Despite the attorney general's new-found skepticism of federal power, this writer, on September 4, 1998, applied the TRO to prohibit enforcement of the amended Act until the case was heard on preliminary injunction. (*See* Sept. 4 Tr. at 17–18.) This Court heard the trial on the merits rather than on preliminary injunction.

F.Supp.2d 1024 (W.D.Ky.1998), *appeal docketed,* No. 98–6671 (6th Cir. Dec. 11, 1998).

One circuit court examined the Virginia law before the district court opinion cited above. A Fourth Circuit judge sitting alone on an appeal of a preliminary injunction held that the law only applied to the D & X. *See Richmond Med. Ctr. v. Gilmore,* 144 F.3d 326, 331–32 (4th Cir.1998). Judge J. Michael Luttig held that the Virginia plaintiffs lacked standing because the limiting interpretation offered by the governor and prosecutors meant that the law did not cover the abortions that the doctors performed.

### V. *Standing*

 Standing is the constitutional requirement that a plaintiff allege a judicially cognizable and redressable injury in order to pursue a lawsuit. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The inquiry involves constitutional limitations to federal court jurisdiction and prudential limitations to its exercise. *See Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Because standing is an element of subject matter jurisdiction, plaintiffs bear the burden of proof. *See Aversa v. United States,* 99 F.3d 1200, 1209 (1st Cir.1996). An analysis of a plaintiff's standing focuses not on the claim itself, but on the party bringing the challenge; whether a plaintiff's complaint could survive on its merits is irrelevant to the standing inquiry. *See Libertad v. Welch,* 53 F.3d 428, 437 n. 5 (1st Cir.1995) (civil RICO case dealing with abortion protests).

 Although the standing doctrine is not easily susceptible to mechanical application, *see New Hampshire Right to Life Political Action Comm. v. Gardner,* 99 F.3d 8, 12–13 (1st Cir.1996), the Supreme Court and First Circuit have adopted a four-part test where a plaintiff facially challenges a criminal statute, *see Babbitt v. United Farm Workers Nat'l Union,* 442

U.S. 289, 298–99, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979); *Gardner,* 99 F.3d at 14.

Plaintiffs in these cases need not violate the law and volunteer their heads on the chopping block. *See Babbitt,* 442 U.S. at 298, 99 S.Ct. 2301; *Gardner,* 99 F.3d at 13. It is enough that the party demonstrate that:

1) he or she intends to engage in a specific course of conduct.

2) the conduct arguably is affected with a constitutional interest

3) the conduct is proscribed by the statute; and

4) a credible threat of prosecution exists.

*See Babbitt,* 442 U.S. at 298, 99 S.Ct. 2301; *Gardner,* 99 F.3d at 14. *See also Rhode Island Ass'n of Realtors, Inc. v. Whitehouse,* 51 F.Supp.2d 107, 111 (D.R.I.1999) (Torres, J.) [*hereinafter R.I. Realtors*], *appeal docketed,* No. 99–1812 (1st Cir. June 30, 1999).

### A. *The "Babbit" Test*

#### 1. *"Intends to engage in conduct"*

Dr. Rodriguez explained that he performs D & Es, vacuum aspirations and both saline and prostaglandin inductions. Similarly, he testified that Planned Parenthood, where he is medical director, hires doctors to perform vacuum aspirations.

The evidence was less clear about Dr. Vogel or the Medical Society. Vogel did not testify, and the immediate past President of the Medical Society, Dr. Michael Migliori, did not allege that any Society members planned to undertake any particular procedures. Dr. Rodriguez testified that Vogel performs both D & E and vacuum aspiration abortions. He also testified that 16 or 17 doctors besides Dr. Vogel and himself perform abortions and belong to the Medical Society. Women & Infants Hospital Senior Vice President Mary Dowd said that doctors perform abortions at Women and Infant's Hospital, but she did not testify about whether those doctors belong to the Society.

### 2. *"Affected by a constitutional interest"*

Abortions are conduct affected by constitutional interest. *See Casey,* 505 U.S. at 846, 112 S.Ct. 2791. Physicians have standing to seek pre-enforcement review of their constitutional claims because they may face criminal prosecution or civil suit under the Act. *See Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). The owners of a medical clinic that provides abortions have similar standing. *See Planned Parenthood v. Doyle,* 162 F.3d 463, 465 (7th Cir.1998). Physicians may assert their own constitutional claims as well as those of their patients because their reaction to the statute affects patients' rights and because patients face practical obstacles to asserting their own claims. *See Casey,* 505 U.S. at 869, 112 S.Ct. 2791 (discussing women's liberty in case brought by doctors); *Singleton v. Wulff,* 428 U.S. 106, 115–16, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).

### 3. *"Proscribed by the statute"*

Plaintiffs lack standing where their interpretation of the statute is unreasonably broad. *See Rodos v. Michaelson,* 527 F.2d 582, 585 (1st Cir.1975) (finding that doctors lacked valid fear). Thus, defendants are correct that standing turns on an initial construction of the Act. But there is no requirement that plaintiffs seeking standing for a facial challenge must adopt the attorney general's narrow construction of the statute. Nor should the Court, at this preliminary stage, interpret the Act as if it were deciding the case on the merits. *See Gardner,* 99 F.3d at 16 ("[I]t is risky business for a district court to enter final judgment at the preliminary injunction stage.") *See also Warth,* 422 U.S. at 500, 95 S.Ct. 2197 (standing does not turn on the merits, but it often turns on the nature and source of the claim). Construction is the pith of this case, so interpreting a statute in the guise of standing merely permits a court to disingenuously disguise a decision on the merits. *But see Rich-*

*mond Med. Ctr.,* 144 F.3d at 331–32 (interpreting the statute and rejecting standing).

Taking the test from *Babbitt* and *Rodos,* this Court examines whether the conduct would be proscribed by a reasonable reading of the statute. The standard is such that actual injury exists where a regulation would have a chilling effect on the exercise of a constitutional right. *Cf. City of Akron v. Akron Ctr. For Reproductive Health, Inc.,* 462 U.S. 416, 427, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) (explaining that abortion right requires physician have room to exercise judgment), *overruled on other grounds, Casey,* 505 U.S. at 881–82, 112 S.Ct. 2791. *See Richmond Med. Ctr.,* 55 F.Supp.2d at 441, 459. For the issue of standing at a minimum, the Act can be read to criminalize D & Es and vacuum aspirations as doctors must perform them in response to predictable complications described above. In deciding the merits of the case, this Court might accept some state-provided narrow construction that keeps the Act from banning the operations, but that would not affect the objectively reasonable belief that plaintiffs' had when they filed suit that they could have run afoul of the Act. They need this Court to settle the issue.

### 4. *"Credible threat of prosecution"*

Even if the statute would proscribe their conduct, plaintiffs lack standing where they face no credible risk of prosecution. *See Gardner,* 99 F.3d at 14. The First Circuit is clear that "credible threat of prosecution" is a forgiving standard. *See id.* Where a statute facially restricts expressive activity, the First Circuit presumes a credible threat in the absence of compelling contrary evidence. *See id.* at 15. Nothing in *Gardner* suggests that the Circuit would limit the presumption to First Amendment cases, especially since it cited contraception and abortion cases in its analysis. *See id.* (citing *Doe,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) (abortion) and *Poe v. Ullman,* 367 U.S. 497, 81 S.Ct. 1752, 6

L.Ed.2d 989 (1961) (contraception)). At the least, *Gardner* shifts the burden regarding statutes that facially restrict constitutional rights onto the state to "convincingly demonstrate that the statute is moribund or that it simply will not be enforced." *Id.* at 16.

■ Taking that cue, defendants say that the Act only proscribes the D & X and promise that they would not prosecute any physician who performed a "conventional abortion." In similar cases, courts have found no standing where the government concedes the unconstitutionality of a statute, *see Sanger v. Reno*, 966 F.Supp. 151, 162 (E.D.N.Y.1997), and where the government has prosecuted a single case in 80 years, *see Poe*, 367 U.S. at 507–09, 81 S.Ct. 1752. Similarly, courts have noted instances in which the government had prosecuted for many years based on a limiting construction. *See Whiting v. Town of Westerly*, 942 F.2d 18, 22 (1st Cir.1991) (town had interpreted "sleep" as "lodge" for years) (deciding vagueness, not standing).

■ But neither situation exists in this case. First, this law was in effect for no more than a week, so defendants' forebearance is not weighty evidence. *See Doe*, 410 U.S. at 188, 93 S.Ct. 739 (distinguishing *Poe* because statute at issue was recent); *Gardner*, 99 F.3d at 15 (citing *Doe* ). Second, defendants never definitively distinguish a conventional abortion from what they would prosecute. Without knowing where prosecutors draw the line, doctors must rely on the Act—and litigation—to explain what is illegal.[3] Third, an attorney general's non-binding promise not to prosecute does not eliminate plaintiffs' standing. *See Chamber of Commerce of the United States v. FEC,* 69 F.3d 600, 603 (D.C.Cir.1995) (cited with favor by the First Circuit in *Gardner*, 99 F.3d at 15). In *Chamber of Commerce*, the D.C. Circuit found standing even where the plaintiffs were "not faced with any present danger of an enforcement proceeding" because nothing kept the Federal Election Commission from changing its mind in the future. *See id. See also R.I. Realtors*, 51 F.Supp.2d at 111 (noting that current attorney general does not bind future attorneys general). In this case, the Attorney General *or his successors* might change their minds, and even more powerfully, the Act's private right of action makes the threat of prosecution more credible and more imminent than in *Chamber of Commerce* because civil plaintiffs would *never* be bound by the attorney general's narrow construction.[4] Defendants need not change their minds for plaintiffs to face civil suits. Any patient, father of a fetus, or maternal grandparent of a fetus could file at any time, so defendants cannot promise that plaintiffs "can leave this Court secure in the knowledge that the

---

**3.** Plaintiffs are correct that no evidence exists that either Attorney General Whitehouse or his predecessor publicized this limited reading beyond making arguments in this case. However, the publicity surrounding this case makes it the ideal forum to publicize those views.

Plaintiffs are also correct that one of defendants' early briefs appears to say that a D & E as Rodriguez performs it "would be manslaughter under the current state of the law." *See* May 4 Tr. at 22–25 (citing Mem. in Supp. of Obj. to Mot. for Prelim. Inj. at 15 n. 3). Defendants' counsel say she meant illegal under the "quick child law," but that was not clear or even suggested by the writing.

Even if plaintiffs had been out of line, defendants evened the score by making the outrageous allegation that plaintiffs might inflict upon a patient "medically inappropriate abortion technique for political reasons." (D.s' Post–Trial Mem. at 94.) Phrasing the slur as a question did not make it appropriate for a legal brief.

**4.** In fact, Superior Court plaintiffs would not be bound by this Court's construction. This Court—like all federal courts—"lack[s] jurisdiction authoritatively to construe state legislation" and bar prosecutors or plaintiffs from filing suit. *Planned Parenthood v. Ashcroft*, 462 U.S. 476, 502 n. 8, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983) (Blackmun, J., concurring and dissenting) (citing *Gooding v. Wilson*, 405 U.S. 518, 520, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972)).

Act will be narrowly· construed and does not apply to the conventional abortions that they perform." (D.s' Pre–Trial Mem. at 15.) [5]

## B. *Which Plaintiffs Have Standing*

 Under the *Babbitt* and *Gardner* analysis, Dr. Rodriguez and Planned Parenthood have standing to contest the Act. These two offered evidence that the Act could· describe D & Es, vacuum aspirations and inductions that they or their agents perform. At the least, the non-medical language of the Act clouds the extent of its coverage. That murkiness chills their and their patients' constitutional rights and potentially exposes them both to criminal prosecution by the state and to civil suit by hundreds of potential plaintiffs a year. That valid fear distinguishes this case from *Rodos,* 527 F.2d at 585. *See also Richmond Med. Ctr.,* 55 F.Supp.2d at 462 (collecting similar cases that found standing).

 There is a dispute as to whether Vogel or the Medical Society has standing. As to Vogel, this Court can assume that any doctor who performs abortions would have a reasonable fear of application of the Act to his conduct. As to the Medical Society, the 16 or 17 members other than Dr. Rodriguez who perform abortions can qualify the Society for associational standing. *See UFCW Union Local 751 v. Brown Group, Inc.,* 517 U,S. 544, 551–54, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996) (discussing the doctrine); *American Postal Workers Union v. Frank,* 968 F.2d 1373, 1375 (1st Cir.1992) (same). However, defendants correctly note that neither Vogel nor the Medical Society put on direct evidence· about their intentions or expectations. In the end, the issue is moot because the standing of Dr. Rodriguez and Planned Parenthood is sufficient to pursue

the injunctive relief that plaintiffs seek. Plaintiffs were represented by a single set of attorneys and seek the· same relief. *See Babbitt,* 442 U.S. at 299 n. 11, 99 S.Ct. 2301 (finding one plaintiff had standing).

## VI. *Abortion Jurisprudence Applies to the Act*

 Defendants argued that the Supreme Court's abortion jurisprudence did not apply to the Act, but this is a specious contention. The procedures described by the Act are abortions, the termination of a pregnancy before birth. The Act does not limit itself to viable fetuses, so this is not a law that covers infanticide, parturition or the killing of "quick" children, *see* R.I.Gen. Laws § 11–23–5 (outlawing willful killing of a quick child); R.I.Gen.Laws § 11–23– 5(c) (defining "quick" in a way consistent with .the use of "viable" during this trial). Nor does defendants' fascination with the internal os bear any legal weight. Defendants invite this Court to create some new protection for fetuses in the vagina, but the Supreme Court drew its line for protection at a time—viability—not at a place—the lip of the uterus.

 In their post-trial memorandum, defendants struggle to link the Act to the Texas parturition statute that the Supreme Court left untouched in *Roe. See Roe,* 410 U.S.· at 117–18 n. 1, 93 S.Ct. 705 (citing law codified at Tex.Rev.Civ.Stat.Ann. art. 4512.5). However, the Texas statute only applied to babies who "would otherwise have been born alive." Tex.Rev.Civ.Stat. Ann. art. 4512.5. It covers only parturition, the birth of a viable baby. *See id.* The Act's ban has no such restriction. In their memorandum, defendants appear to assume that the use of the words "partial birth" somehow makes the Act apply only to viable births. The author of that passage seems to ask this· Court to trump the

---

5. The same analysis defeats the ripeness argument that defendants raised early in this case, (*see* D.s' Pre–Trial Mem. at 16–17), and seem to have conceded by raising it only in the most-skeletal fashion at trial. One thing is

clear—there is no possibility that the attorney general has the final word on the construction of the Act. The Act's private right of action encourages civil actions against plaintiffs.

Act's definition of "partial birth abortion" with some reckoning deduced from a medical dictionary's definition of "complete birth." Partial birth, defendants suggest, means "the incomplete separation of the infant from the maternal body." (D.s' Post–Trial Mem. at 68.) That is facetious. First, partial birth means what the Act says it means. This Court looks to the legislation's definition, which is broader and does not distinguish between pre- and post-viability. Second, the memorandum's definition is meaningless and hopelessly vague. "Incomplete separation" sounds as if it refers to abortions that were abandoned in mid-operation.

Therefore, this is a dispute over abortion, and it is controlled by the case law headlined by *Roe* and *Casey*.

## CONSTRUCTING THE ACT'S DEFINITION

VII. *How To Read The Act*

The Act bans partial birth abortions. Plaintiffs argue that the definition of partial birth abortions extends to cover almost all abortions performed in the state. Defendants demur. In this Section, this Court decides what language is at issue and how that language should be constructed under the Supreme Court's rules on interpreting state statutes. In Section VIII, this Court will apply that language to the medically-accepted abortion types to decide preliminarily whether it could ban any of them.

A. *What Language is at Issue?*

The issue here is the Act's definition of partial birth abortion in R.I.Gen.Laws § 23–4.12–1. Not at issue are definitions offered by the AMA, ACOG and medical dictionaries. Nor the articles written by Drs. Haskell and McMahon with their details about Metzenbaum scissors and three days of dilation.

Defendants proved that some people use the words "partial birth abortion" to refer to the D & X. They offered AMA and ACOG documents that appear to equate the terms although partial birth abortion has no settled meaning, especially not a medical one. They even offered Dr. Boehm's hoary theory of statutory construction that he believes limits the Act's language to an intentional performance of an ACOG-defined D & X.

■ But the Legislature did not rely on the medically-accepted interpretation of "partial birth abortion." The Legislature created a specific definition. It did not adopt the ACOG definition of D & X. It did not use the words "D & X" or "intact D & E." It did not reference the papers by Dr. Haskell or Dr. McMahon. It did not even leave the term undefined and rely on general usage or dictionaries. Legislatures have the power to define words in legislation even to the point of conflicting with the words' common meaning. *See, e.g.,* 18 U.S.C. § 924(c)(2) (defining "drug trafficking" convictions to include drug possession convictions if they were felonies). But when that legislation comes under constitutional attack, legislatures must live with the definitions that they have chosen.

It would be unreasonable for doctors to ignore the Act's definition and to trust that "partial birth abortion" means "D & X." Certainly, some physicians and medical organizations use the terms interchangeably, but those third-party definitions do not overrule the language utilized by the Legislature. They are relevant only as they weigh on the reasonableness of plaintiffs' definition of terms within the Act. In deciding this case, this Court focuses on R.I.Gen.Laws § 23–4.12–1(a) & (c).

B. *Comity and the Presumption of Constitutionality*

■ This Court recognizes that the Act must be read in a light favorable to seeing it as constitutional. A federal court must consider limiting constructions offered by the state, in this case by the Attorney General. *See Forsyth County v.*

*Nationalist Movement,* 505 U.S. 123, 131, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (First Amendment case); *Kolender v. Lawson,* 461 U.S. 352, 355, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (14th Amendment case); *Whiting,* 942 F.2d at 21 n. 3 (14th Amendment case). Even if the state offered no limiting construction, a state statute enjoys the presumption of constitutional validity, so in this facial challenge, this Court must apply any reasonable construction that would be constitutional. *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988).

 But the text of the Act amounts to more than lines in the sand for this Court to erase and redraw in a constitutional design. A limited construction only applies where, as the Supreme Court has alternatively said, the law is "readily susceptible" or the construction is "reasonable and readily apparent." *See Reno v. ACLU,* 521 U.S. 844, 884, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997); *Boos v. Barry,* 485 U.S. 312, 330, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988); *Virginia v. American Booksellers Ass'n,* 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). This Court will narrow the Act where the statute or legislative intent "identifie[s] a clear line that th[e] Court could draw." *Reno,* 521 U.S. at 884, 117 S.Ct. 2329.

## C. *What The Definition Means*

Throughout this dispute, defendants offered a wide variety of narrow constructions. Because the limited reading of the Act was so central to their case, defendants proffered a novel one at almost each step of litigation. Although most had the rickety look of lawyerly rationalizations, this Court remains mindful of the doctrines above and considers even those that conflict with each other. If any reasonable reading could be viewed as constitutional, then the Act could be narrowed and could survive. However, by thrashing about, defendants—like swimmers adrift in a shark-infested lagoon—only call attention to their dire predicament.

### 1. *Defendants' unreasonable constructions*

Most of defendants' offerings were so unreasonable that this Court can dispose of them summarily. Rather than paraphrase reasoning that varied slightly as defendants reargued the issues, the Court cites archetypical phrasings of three arguments from defendants' written briefs.

a) *"The Act targets the intentional performance of the type of abortion described by ACOG."*

(D.s' Post–Trial Submission at 19.)

 Nothing in the Act mentions ACOG. Nothing in the Act mentions four distinct steps, which is a key to the four-part ACOG definition. Nothing in the Act comes close to using terms akin to "instrumental conversion of the fetus to a footling breach," "breech extraction," or "partial evacuation of the intracranial contents." Dr. Boehm's claim that the Act only bans ACOG-defined D & Xs was the legal conclusion of a medical partisan. The Act could never reasonably be read to limit partial birth abortions to ACOG-defined D & Xs.

b) *"The [Act does] not apply to anything except the delivery of an* **intact fetus** *or a* **substantial portion** *of an intact fetus, and not to the extraction of dismembered body parts, no matter how substantial."*

 (D.s' Pre–Trial Mem. at 19 (citing *Richmond Med. Ctr.,* 144 F.3d at 328–29) (emphasis in original).) (*See also* Ds Post–Trial Submission at 32 (equating the D & X to the "killing of a live, intact fetus that is wholly or substantially outside of the uterus").)

This tack might appeal to an activist judge, but this Court does not write legislation. The Act does not mention an "intact" fetus. In fact, it explicitly equates a

living fetus with a "substantial portion thereof." R.I.Gen.Laws. § 23–4.12–1(c). Defendants said themselves that the Legislature did not use the word "intact" because it would create too many loopholes. (*See* D.s' Post–Trial Submission at 54.) Adding a term like "intact" to the definition would, at best, be creating law from thin air and would, at worst, be contradicting the Act's plain language.

c) *"A 'partial birth,' therefore, is the incomplete separation of the infant from the maternal body ... [A partial birth abortion] is the abortion of a birth-in-progress."*

(D.s' Post–Trial Submission at 68.)

 As noted in Section VI, the Act does not limit itself to viable births, so partial birth abortion cannot mean only an abortion during the birth of a viable child. Thus, this definition, built in contrast to a medical dictionary's definition of "complete birth," is meaningless and unreasonable before it is even placed into the context of the Act. It describes an operation in which the infant is left attached in some fashion to the mother. The idea is barely explained in the brief, and the idea is as half-baked as it was half-argued.

This definition and the discussion that surrounds it in Defendants' Post–Trial Submission incorporate another argument that permeates their reading of the Act. Defendants suggest that the Act is limited to operations in which the procedure that kills the child occurs in the vagina. Defendants differentiate between a fetus killed in the uterus and one killed in the vagina. (*See, e.g.,* id. at 69. *See also* D.s' Closing Argument, May 6 Tr. at 40–42.) This is unreasonable because, as a matter of fact, it is impossible for doctors to differentiate between procedures that occur in the uterus or vagina. There is no bright line. In fact, many crucial events occur on both sides of the os. For example, the doctors testified that they often grasp a portion of the fetus inside the vagina and pull until the body jams at the os and tears apart.

A leg might be yanked off the body. Trauma and bleeding lead to death, but it is unclear whether that procedure occurred in the vagina where the leg was pulled or in the uterus where the bleeding trunk of the fetus remains. Conversely, the D & X requires the doctor to deliver the body feet-first until the head lodges at the os and then to puncture the skull and suction out the brain. Even though this would constitute the classic situation that defendants seek to outlaw, the puncture and suctioning occurs inside the uterus even though the heart and body die in the vagina.

Therefore, it would be unreasonable to read into the Act any limitation based on a comparison with the medical definition of "complete birth" or based on the location of the procedure that kills the fetus.

2. *How the Act will be read*

 The keys to construing the Act are the sequencing of actions and the scienter clause. The reasonable reading that comes closest to being constitutional—although certainly not the most-reasonable reading—is that doctors must perform three actions in order, that they intend to kill the infant, and that they act knowingly.

The sequencing requirement is suggested by the Act's language because the definition of partial birth abortion requires that a person vaginally deliver the fetus, then kill the infant, and finally complete the delivery. *See* R.I.Gen.Laws 23–4.12–1(a). The intent to conduct an abortion is inherent because the Act defines partial birth abortion as "an abortion," *see id.,* and limits "vaginally delivers" to delivering "for the purpose" of killing the infant, *see* R.I.Gen.Laws § 23–4.12–1(c). This excludes unintended deaths that occur during the natural birth of a child because the doctor would not vaginally deliver the baby with the intent of killing it. The scienter element is included both in the "for the purpose of" killing the infant, *see* R.I.Gen.

Laws § 23–4.12–1(c), and in the criterion that a partial birth abortion must be performed "knowingly," *see* R.I.Gen.Laws § 23–4.12–2. This excludes any deaths caused by a doctor's negligence or recklessness.

Therefore, this Court holds that the Act's definition must be read as follows: To face prosecution for conducting a partial birth abortion, physicians must intend to conduct an abortion and then follow a series of actions. They must deliver a "substantial portion" of the fetus into the vagina; then perform a procedure dependent on that delivery that kills the infant; and then complete the delivery. This progression violates the Act only if the first element is done with the purpose of killing the fetus and if each element is done knowingly.

## VIII. *Preliminary Question: Does the Act Ban Any Abortions?*

As a preliminary step, this Court compares this language to the abortion procedures conducted in Rhode Island. As an analogy, this step parallels considering a motion for summary judgment. The issue of whether "substantial portion" is vague remains undecided. However, this Court can winnow other issues because several abortion procedures would be untouched by the Act even if this Court assumes that "substantial portion" is vague. If the definition's other facets had made the Act inapplicable to *any abortion* procedure, then this case could have ended at this juncture. As it turns out, the definition may describe the D & E, and this Court must continue in Section IX to discuss vagueness and undue burden. However, this Section's precursory analysis simplifies the pivotal discussion in Section IX.

## A. *The Act's Effect on Hysterectomies and Hysterotomies*

■ The Act could never ban hysterectomies and hysterotomies as described at trial. In both, the fetus is removed through the wall of the uterus rather than through the vagina. The baby is never vaginally delivered.

## B. *The Act's Effect on Vacuum Aspirations and Inductions*

■ The Act could never outlaw vacuum aspiration or inductions as described at trial.

The vacuum aspiration depends on the dismemberment of the fetus inside the uterus with a suction wand. Death results from trauma and blood loss as the doctor breaks up the tiny body. There is no delivery into the vagina for the purpose of performing a subsequent procedure that will kill the infant. Plaintiffs highlighted the predictable complication when fetal body parts congest the cannula. At those times, the doctor must pull the wand through the vagina and outside the woman's body to clear the obstruction. The cannula is then returned to the uterus. However, that "delivery" through the vagina is not for the purpose of conducting another procedure that kills the fetus. No doctor asserted that such a complication would separate the operation into two procedures. Rather, they all portrayed the vacuum aspiration as having a single, unified step. They portrayed the suctioning as a single procedure. Factually, the Act does not describe the vacuum aspiration as doctors described it at trial.

Plaintiffs argue that this passage of fetal parts through the vagina is "for the purpose" of clearing the canella and returning it for the fatal blows. Grammatically, they wish "procedure" in § 23–4.12–1(c) to mean the entire abortion operation. But that reading would make any action by the doctor related to the abortion "for the purpose" of killing the fetus. Such an interpretation would make the phrase meaningless and would ignore the reasonable reading that the delivery into the vagina must be for the purpose of a subsequent procedure that kills the fetus. That "procedure" in § 23–4.12–1(c) must be a

sub-procedure of the entire abortion operation.

Similarly, the induction depends on fetal death caused either by the injection or by premature birth. Either the fetus dies in the uterus, or it dies after being born because its lungs and heart are too young to survive without its mother. Therefore, the delivery into the vagina is not induced for the purpose of performing another procedure that kills the fetus. Its death is inevitable once the induction begins. Plaintiffs point to the predictable complication where the fetus's head jams at the os because the cervix has not dilated sufficiently. In those cases, the doctor may crush the skull, killing the fetus if it still lives, but those complications are unexpected and, as the doctors testified, unwanted. Therefore, the purpose of delivering the child into the vagina is not to perform the subsequent head-crushing.

### C. The Act's Effect on D & Es

The Act could make doctors criminally liable for performing the D & E as described at trial. If "substantial portion" includes a fetus's arm or leg, then the Act's definition describes a D & E.

A doctor performing a D & E tears the fetus's body into pieces using instruments. One of the basic techniques is to reach into the uterus and grasp an extremity. The doctor extracts as much of the body as possible into the vagina, and the remainder jams at the os. Then, the doctor pulls until the traction against the uterine wall breaks apart the fetus. Needless to say, the injury causes trauma and bleeding.

If "substantial portion" is either vague or includes an extremity, then this series of actions violates the Act when it is read in the only reasonable construction that might survive the Constitution. *See* Section VII(C)(2), *supra*. The doctor grabs a substantial portion of the fetus and delivers it into the vagina. This is done with the intent of performing a second procedure—the pulling and traction—that the doctor knows will kill the child. The pull-

ing and traction kill the child. Then, the doctor completes the delivery. The doctors described these as distinct procedures, (*see* May 5 Tr. at 51–53 (Dr. Stubblefield)), which factually distinguishes the D & E from the vacuum aspiration.

### THE ACT'S UNCONSTITUTIONAL FLAWS

### IX. The Definition Is Unconstitutional

This Court now comes to the crux of the legal analysis. The definition in Section VII(C)(2) is reasonable, but to be useable, it must be clarified. What is a "substantial portion" of a fetus? How do doctors know when they would violate the law? The Act does not offer a definition. The witnesses in this case could not agree. In fact, they offered definitions that were not even similar: a toe (Dr. Rodriguez), any extremity, (Dr. Stubblefield), any fetal part more than a single arm or leg, (Dr. Boehm), and either a head or at least both legs and half the abdomen (Dr. Boehm). (For these definitions, see respectively May 3 Tr. at 147–48; May 4 Tr. at 86; Video Tr. at 131–33; Video Tr. at 66–67.) In their Post–Trial Submission, defendants did not even offer their own proposal. They cited excellent precedents for the proposition that "substantial" is not inherently vague, (*see* D.s' Post–Trial Submission at 57–59), but they do not explain what "substantial portion" means in the Act.

There are two possible answers: either "substantial portion" is vague or it has a reasonable definition that doctors could accept. After hearing the evidence in this case, this Court finds that "substantial portion" is vague and does not provide doctors with sufficient guidance to know what the Legislature has made illegal. As explained at length below, doctors have no way to decide what "substantial portion" means, so they must assume that an arm or leg would qualify under the Act. That means they must assume that the D & E is illegal. This chilling effect bans the D &

E, and any law that bans the D & E places an undue burden on a woman's ability to receive an abortion.

### A. *The Definition Is Vague*

#### 1. *The law of vagueness*

Laws are unconstitutionally vague where they fail to provide the requisite notice and undermine public confidence that the laws are equally enforced. *See City of Chicago v. Morales,* —— U.S. ——, ——, 119 S.Ct. 1849, 1859, 144 L.Ed.2d 67 (1999); *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *United States v. Hilton,* 167 F.3d 61, 74–75 (1st Cir. 1999). The standard for overturning a law based on this doctrine is stringent. *See Hilton,* 167 F.3d at 75. A statute will not be held void for vagueness unless it fails to define the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary or discriminatory enforcement. *See Grayned,* 408 U.S. at 108, 92 S.Ct. 2294; *Hilton,* 167 F.3d at 75.

A plaintiff may make a facial vagueness challenge even where no First Amendment right is at play. *See Morales,* —— U.S. at ——, 119 S.Ct. at 1856–57 (affirming the invalidation of a loitering ordinance that infringed on a 14th Amendment right).

The vagueness analysis is inherently fact-based and should not be applied mechanically. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) ("depends in part on the nature of the enactment"); *United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.,* 874 F.2d 20, 32 (1st Cir.1989). However, the First Circuit has boiled down Supreme Court precedents to emphasize four factors that a trial court should consider:

1) economic regulation is subject to a less-strict test.

2) there is greater tolerance of enactments with civil rather than criminal penalties.

3) a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the defendant that his conduct is proscribed.

4) perhaps the most important factor is whether the law threatens to inhibit the exercise of constitutionally protected rights.

*See Bay State Ambulance,* 874 F.2d at 32. *See also Village of Hoffman Estates,* 455 U.S. at 498–99, 102 S.Ct. 1186.

#### 2. *"Substantial" is vague*

"Substantial portion" is the statute's linchpin because evidence in this case suggests that it would be close to impossible to deliver the entire fetus into the vagina and then conduct another procedure before completing delivery. A fetus in the later stages of pregnancy is longer than the vagina. So by the time the entire fetus has completely left the uterus, its leading edge has already begun leaving its mother's body. Complete delivery comes rapidly, if not inevitably, because there is nothing to retard the progress. Therefore, the vast majority of situations in which the Act would apply would involve a "substantial portion" of the fetus being delivered before some procedure was done to it.

As noted above, the doctors who testified in this case could not reach a consensus about the meaning of "substantial portion." In fact, their interpretations ranged between extremes, which were obviously influenced by their ideological views: toe (Dr. Rodriguez), any extremity, (Dr. Stubblefield), any fetal part more than a single arm or leg, (Dr. Boehm), and either a head or at least both legs and half the abdomen (Dr. Boehm). (For these definitions, see respectively May 3 Tr. at 147–48; May 4 Tr. at 86; Video Tr. at 131–33; Video Tr. at 66–67.) Certainly, the medical commu-

nity has not been assisted by defendants, who gyrated on whether they thought the definition included an implied "intact" or mirrored the ACOG interpretation. *See* Section VII(C)(1).

The hefty dictionary that has served this writer for more than a decade defines "substantial" with several inches of tiny type. *See* Webster's Third New Int'l Dictionary 2280 (1986). *See also* id. at 2279 (defining "substance"). The gist is a "substantial" portion of something is an important portion, an essential portion.

The crux of this dispute is about a "substantial portion" of a fetus being pulled into the vagina. Witnesses talked about measuring a fetus by body parts (i.e., an arm or two legs being substantial because of their size), by percentage of its total mass (i.e., 51% being substantial because it was more than half), and by functionality (i.e., a head being substantial because its loss is fatal). Witnesses disagreed about whether the portion had to be still attached to the remaining body. Even after trial, defendants advocated two different ways of measuring "substantial"—one by volume ("at least one-half of the fetus") and one by function (the head alone). (*See* D.s' Post–Trial Submission at 15.) Thus fair-minded people could disagree about the meaning and could not predict what would violate the law.

This is not a matter of an ambiguous dispute between two possible answers. In fact, nothing in the Act suggests a clear line for this Court to draw. *See Reno,* 521 U.S. at 884, 117 S.Ct. 2329. Would a limb qualify? What is an essential *or important* part of a fetus? Does the measurement depend on whether the portion is still attached to the fetus's body? Those questions are unanswerable by doctors, prosecutors or the lay people who could be civil plaintiffs or jurors. They would have to guess at when the Act applied. Therefore, the phrase is so vague as to be meaningless.

 The scienter element of the statute cannot cure this vagueness. A scienter requirement may mitigate vagueness in some cases, *see Village of Hoffman Estates,* 455 U.S. at 499, 102 S.Ct. 1186, but it does not automatically save the statute, *see Colautti v. Franklin,* 439 U.S. 379, 395 n. 13, 99 S.Ct. 675, 58 L.Ed.2d 596. In First Circuit cases, scienter requirements cured vagueness about notice where the government had to prove that criminal defendants had knowingly violated a statute. *See, e.g., Hilton,* 167 F.3d at 75 (knowingly possessed pornography that depicted models that appeared to be under 18 years old); *Bay State Ambulance,* 874 F.2d at 33 (knowingly made payments to induce fraud). In both cases, the United States had to prove that a defendant understood the legal standard—underage appearance and inducement to fraud, respectively—and that the defendant thought his act violated the law.

In contrast, the Act is vague when it describes the legal standard; "substantial portion" is indispensable because it defines what the Act proscribes. In *Hilton,* there could be no vagueness because the defendant had to subjectively believe that the models appeared to be younger than 18. In *Bay State Ambulance,* the defendant had to subjectively believe that the payment was made to induce fraud. In this case, neither doctors nor this Court can tell what a defendant would have to know. The Act's scienter requirement modifies a vague term. While people can know what it means to pay to induce fraud, they cannot know how to define "substantial portion" of the fetus, so the scienter requirement cannot save the Act.[6]

---

6. The vagueness test asks whether doctors could interpret the Act. If this Court had found that the phrase was clear and doctors accepted a definition of "substantial portion," then that definition would need to pass constitutional muster. Specifically, the definition could not ban the D & E or other protected operations.

That would be a legal decision left up to the Court. Because the D & E is protected by the

In sum, ordinary physicians have no notice of what is illegal under the Act. At the peril of life, liberty or property, they must speculate on the meaning of "substantial portion." *See Morales,* —— U.S. at ——, 119 S.Ct. at 1860 (plurality opinion). Those who perform D & Es are incapable of avoiding the law without stopping their practice because the only reasonable construction of the statute describes the D & E.

Defendants should not be shocked by this outcome. Their counsel emphasized in her closing argument that the Act must be broad in order to be "workable," namely to guarantee the outlawing of all operations that offended the Legislature. (*See* May 6 Tr. at 43–45.) She explained that amendments that would limit the scope would also open loopholes for doctors to escape liability. (*See id. See also* D.s' Post–Trial Submission at 52–53.) Therefore, the Legislature staked out broad language and avoided a bright line. The problem is that the D & X is a variant of the D & E, a procedure that follows similar steps and relies on the same pool of surgical techniques. The D & E fell under the shadow of the Act because the Act simply spreads out too far.

### B. *The Vagueness Creates An Undue Burden*

#### 1. *"Casey" and "Salerno"*

■ Courts disagree about whether the Supreme Court has created a special procedure in evaluating the constitutionality of abortion laws. On the one hand, the Supreme Court's general rule is that a court may only invalidate a law on a facial challenge where "no set of circumstances exists under which [the law] would be valid." *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). On the other, the same court invalidated the law in *Casey* even though it accepted that it created no burden for the

Constitution, any accepted definition of "substantial portion" would have to exclude what-

vast majority of women. *See Casey,* 505 U.S. at 894, 112 S.Ct. 2791. The *Casey* Court, without mentioning *Salerno,* instructed a court to invalidate a law that would operate as a substantial obstacle to a woman's choice of abortion in a large fraction of the cases in which it applies. *See id.* at 894–95, 112 S.Ct. 2791.

Circuits have split over whether *Casey* effectively overrules *Salerno,* at least in the forum of abortion rights. *Compare Planned Parenthood v. Miller,* 63 F.3d 1452, 1458 (8th Cir.1995) (finding *Salerno* to be "effectively overruled") *with Barnes v. Moore,* 970 F.2d 12, 14 n. 2 (5th Cir. 1992) (finding no overruling). Even Supreme Court justices disagree on whether the *Salerno* standard has been supplanted. *Compare Fargo Women's Health Org. v. Schafer,* 507 U.S. 1013, 1014, 113 S.Ct. 1668, 123 L.Ed.2d 285 (1993) (O'Connor, J., concurring) (*Casey* analysis controls) *with Ada v. Guam Soc'y of Obstetricians & Gynecologists,* 506 U.S. 1011, 1011–13, 113 S.Ct. 633, 121 L.Ed.2d 564 (1992) (Scalia, J., dissenting) (*Salerno* analysis controls). The First Circuit has not weighed in on this issue yet.

This Court holds that *Casey* provides a specific test for courts to apply in the abortion context. This conclusion follows in the wake of the majority of circuit courts who decided this issue. *See Planned Parenthood v. Lawall,* 180 F.3d 1022–1027, (9th Cir.1999); *Women's Med. Prof'l Corp.,* 130 F.3d at 193–97 (6th Cir. 1997); *Jane L. v. Bangerter,* 102 F.3d 1112, 1116 (10th Cir.1996); *Miller,* 63 F.3d at 1456–58 (8th Cir.1995). But the true justification for the holding is that, as the Eighth Circuit wrote so trenchantly, the outcome in *Casey* depended on the creation of the new test:

> We choose to follow what the Supreme Court actually did—rather than what it failed to say—and apply the undue-burden test. It is true that the Court did not expressly reject *Salerno*'s applica-

ever portions of the fetus are normally delivered into the vagina during a D & E.

tion in abortion cases, but it is equally true that the Court did not apply *Salerno* in *Casey*. If it had, it would have had to uphold Pennsylvania's spousal-notification law, because that law imposed "almost no burden at all for the vast majority of women seeking abortions." *Casey*, 505 U.S. at 894, 112 S.Ct. 2791. Instead, the Court held that "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Id.* If the law will operate as a substantial obstacle to a woman's choice to undergo an abortion "in a large fraction of the cases in which [it] is relevant, . . . [i]t is an undue burden, and therefore invalid." *Id.* at 895, 112 S.Ct. 2791.

We believe the Court effectively overruled *Salerno* for facial challenges to abortion statutes.

*Miller*, 63 F.3d at 1458 (citations updated).

Certainly, the Supreme Court could have explained its analysis more explicitly in *Casey*. However, this Court is comfortable relying on the new test because it is a core holding of the Supreme Court's decision. The Supreme Court has recently cautioned lower courts against construing an opinion as overruled unless the Supreme Court speaks explicitly. *See Hohn v. United States*, 524 U.S. 236, ——, 118 S.Ct. 1969, 1978, 141 L.Ed.2d 242 (1998); *Agostini v. Felton*, 521 U.S. 203, 236, 117 S.Ct. 1997, 2017, 138 L.Ed.2d 391 (1997). But the fact is that *Casey* is "the case which directly controls" this issue. *See Agostini*, 521 U.S. at 236, 117 S.Ct. at 2017. By voiding the Pennsylvania law, the *Casey* Court created a new standard.

### 2. The law of undue burden

A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus. *See Casey*, 505 U.S. at 877, 112 S.Ct. 2791. A statute with a valid purpose that places a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends. *See id.*

The Act is not a structural mechanism that Rhode Island uses to express an interest in fetal life. *See Casey*, 505 U.S. at 877–78, 112 S.Ct. 2791. This is not a way to inform women or persuade them to choose childbirth. *See id.* Instead, the Act's clear purpose is to cull the list of available abortion techniques. Some operations that were legal in 1996 would be illegal under the Act. The breadth of that culling is in dispute, but even defendants do not suggest that the Act champions some educational agenda.

### 3. Banning the D & E creates an undue burden

■ The D & E is a crucial procedure for women who want abortions, especially those seeking abortions between 12 and 20 weeks when vacuum aspirations or inductions are generally unavailable. Women need not explain to the government why they want an abortion. However, the reasons that women seek abortions after a vacuum aspiration is unavailable include the mother's medical complications, genetic flaws discovered by prenatal testing, or the cost of the operation. In addition, the D & E might be preferable to the induction procedure between 20 and 23 weeks even though either would be available. For example, a woman may be too ill to endure labor, or she may want to avoid the physical and psychological effects that accompany a still-birth.

By banning the D & E, the Act would force women to travel across state lines or to undergo operations that would be more dangerous. That danger could come about from the inherently greater risk of an induction, or it could result from delaying the abortion until after the 20th week when inductions are available. Those effects, to return to *Casey*, amount to a "substantial obstacle in the path of a wom-

an seeking an abortion of a nonviable fetus." *Casey,* 505 U.S. at 877, 112 S.Ct. 2791. Thus, the Act is unconstitutional.

## X. *The Statute Lacks the Health Exception*

■ The Supreme Court requires an exception to any abortion ban that would allow a woman to undergo an abortion if her pregnancy would constitute a threat to her health. *See Casey,* 505 U.S. at 879–80, 112 S.Ct. 2791; *Roe,* 410 U.S. at 164–65, 93 S.Ct. 705. This exception must apply even after viability. *See Casey,* 505 U.S. at 879, 112 S.Ct. 2791. A state cannot preclude women with physical or mental problems from pursuing the safest abortion. *See Thornburgh v. ACOG,* 476 U.S. 747, 768–69, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986).

The D & E is often necessary for a woman's health. Plaintiffs explained several conditions, such as renal failure, depression or primary pulmonary hypertension, that could make abortion necessary. Especially where the pregnancy has advanced past the time for vacuum aspiration, the D & E will often be a safer alternative to inductions or hysterotomies. This Court has already held that the Act bans the D & E, so the Act requires a health exception.

■ Even if the Act only banned the D & X as defined by ACOG, it would require a health exception. Defendants claim that a D & X could never be necessary to save a woman's health, but the evidence at trial failed to support that contention. Such assertion by Dr. Boehm was unbelievable, especially when he also noted that people cannot "make a blanket statement about emergency abortions." (Video Tr. at 56.) Defendants' own evidence—the statement by ACOG that all the doctors treated with deference—demonstrates that doctors believe the D & X "may be the best or most appropriate procedure in a particular circumstance to save the life or preserve the health of a woman." (D.s' Ex. D at 2.) The D & X may not be taught in medical schools or tested in peer-reviewed journals, but the fact that a procedure is new is not grounds to say it cannot be used. There are women who cannot undergo an induction or hysterotomy, and the D & X is either as safe or safer than the D & E for those women, particularly because the D & X requires fewer passes of sharp instruments into the uterus. Therefore, this Court finds that the D & X could be used to preserve a woman's health and must be available to physicians and women who want to rely upon it.

In summation, the Act lacks a health-of-the-mother exception. The flaw is as simple to see as the exception would be to draft. The state may not strip a woman of her right to medical care. Thus, the Act is unconstitutional.

## XI. *The Statute Lacks a Proper Life Exception*

■ The Supreme Court requires an exception to any abortion ban that would allow an abortion to save the life of the mother. *See Casey,* 505 U.S. at 879, 112 S.Ct. 2791; *Roe,* 410 U.S. at 164–65, 93 S.Ct. 705.

■ The Act has such an exception, but it limits the exception to times when "no other procedure would suffice." R.I.Gen.Laws § 23–4.12–3. That is an unconstitutionally meager exception. If a woman could die, then she has the constitutional right to have *any and all operations* that would save her life. She and her doctor decide what operation is appropriate. During an emergency, doctors must act rapidly and address ever-changing crises. The state may not risk a woman's life merely because the tool for saving her life would be a particular abortion technique.

As noted above, this Court has found that the Act bans the D & E along with the D & X. The D & E can certainly be used to save a woman's life, and therefore, this Act is void for failing to allow for an appropriate "woman's life" exception.

But to emphasize the flaw, this Court assumes defendants' limited interpretation arguendo. Defendants argue that because the D & X as defined by ACOG cannot be done rapidly, it cannot be used to protect a mother's life. However, defendants introduced the ACOG statement explaining that a D & X may be the best or most appropriate procedure to save a life. (*See* D.s' Ex. D at 2.) Merely because an operation must be done over hours or days does not mean it cannot be used to save a woman's life. The constitutional exception is not limited to exigent circumstances; it is concerned with life-saving generally. If the D & X were necessary to save a life, then women must be allowed access to it.

Without a proper exception to save the life of the mother, the Act is unconstitutional.

## XII. *The Private Right of Action Is Unconstitutional*

▮ A state may not require a married woman to notify her husband before she undergoes an abortion because that places an undue burden on her constitutional right. *See Casey*, 505 U.S. at 887–898, 112 S.Ct. 2791. The Supreme Court explained why women would be reluctant to notify their husbands. *See id.* at 888–94, 112 S.Ct. 2791. The Court found that a notification requirement is likely to prevent a significant number of women from obtaining abortions. *See id.* at 893–95, 112 S.Ct. 2791. The *Casey* Court characterized this as a substantial obstacle. *See id.* at 893–96, 112 S.Ct. 2791. The woman's right to an abortion overcomes a husband's interest in the pregnancy. *See id.* at 895–98, 112 S.Ct. 2791.

▮ Adult women need not consult with their parents or other people in the fashion that minors may be required. *See Casey*, 505 U.S. at 895, 112 S.Ct. 2791 (noting the difference between minors and adults).

▮ It is a fact that the private right of action in R.I. Gen. Laws § 23–4.12–4 will cause doctors to require pre-abortion consent from the father of the fetus and the mother's parents. Dowd and Rodriguez testified persuasively that Women & Infants and Planned Parenthood, respectively, would avoid suits by requiring consents from those persons for all abortions. Any prudent doctor would do the same, although this ruling could convince them to seek permission only for D & Es. The Act's private right of action gives fathers— even those not married to the mother— and women's parents the right to sue a doctor who violates the Act. Based on the credibility of the trial witness, this Court finds factually that clinics and hospitals will contract that right away by requiring consent from patients' parents and sexual partners similar to the "informed consents" used before patients undergo operations.

The burden created by the Act is even greater than the one created by the law voided in *Casey*. First, it gives power over the abortion decision to people more attenuated from the pregnancy than the husbands mentioned in the Pennsylvania law. The *Casey* Court found that a woman's right to an abortion trumps her husband's interest, so her right certainly must triumph over the interests of an unmarried father of the fetus or her own parents. Second, it gives greater power to these third parties. Obviously, a person who must consent to an abortion must be notified about it. Thus, the Act forces women to notify their parents and sexual partners; *plus* it forces them to ask these third parties to consent to the abortion.

For the same factual reasons identified by the *Casey* Court, this Court finds that some women will be reluctant to contact their parents and sexual partners for consent. As the *Casey* Court instructs, this Court considers this group of women when it weighs the effect of the Act. As explained above, the Act's burden is even heavier than the one voided in *Casey*. More women will be affected, and the third parties will have even more power to

thwart a woman's decision about her pregnancy.

■ Therefore, this Court holds that a state may not create a private right of action through which any person other than the patient could sue a doctor for providing an abortion.[7] A woman has the right to an abortion. She has the right to make the ultimate decision about her pregnancy. The threat of civil suit will be enough to keep doctors from providing abortions without consents. Such required consents constitute significant obstacles to obtaining abortions. Therefore, the private right of action contained in R.I. Gen. Laws § 23–4.12–4 is unconstitutional.

## XIII. *Substantive Due Process and Equal Protection*

The Court declines to reach plaintiffs' arguments about substantive due process and equal protection. The issues would appear relevant where the government bars a single procedure and doctors or women argue that there is no justification for the ban. For example, a state might ban the D & X as defined by ACOG. *Cf. Planned Parenthood v. Danforth,* 428 U.S. 52, 78–79, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (invalidating ban on saline inductions). However, this Court has found that the Act does not fit that bill. The Act is so different and the issues are so intricate that this must await a different case and controversy.

## CONCLUSION

This dispute has been a singular example of disciplined lawyering amid a larger debate that incorporates moral and controversial elements extrinsic to a constitutional challenge. Counsel for both sides presented sterling briefs and arguments that surpassed any missteps mentioned in this Decision. In particular, plaintiffs' Post–Trial Reply Memorandum was written with devastating clarity. This Court relied heavily on the parties' thorough research and sophisticated analysis.

Defendants' entire case rests on the assumption that the Act bans only a tiny swath of abortions. Defendants argue that this Court must defer either to legislative intent or to the attorney general's narrow construction. To the contrary, the plain language of the Act is at the core of this dispute, and the Act bans far more than just the D & X. Defendants' ever-changing explanations about what the Act bans were muddled and untenable, and the Fourth Circuit's detailed editing of similar language confirms that a court could only save the Act by stepping in as a super-legislature. The fundamental nature of defendants' flawed view is exposed in their alternating arguments that the Act's definition is narrow enough to survive a constitutional challenge yet wide enough to offer doctors no loopholes to escape.

To summarize, the Act suffers from four distinct constitutional flaws. First, the Act defines "partial birth abortion" in a fashion that vaguely defines what it outlaws such that doctors would not know whether it bans abortions known as D & Es. As such, the entire Act is unconstitutional because it places an undue burden on a woman's right to an abortion. Second and third, the entire Act is unconstitutional because it lacks the exceptions for the woman's health and life mandated by the Supreme Court. By its own terms, the current "life of the mother" exception cannot be severed from the Act. Fourth and independently, the private right of action is unconstitutional because it places an undue burden on the woman's right to an abortion. This Court notes that none of these flaws depend on the Act's status as a state law. They would exist in a federal statute with the same language.

This Court does not decide whether the Legislature may ban the D & X procedure

---

7. Nothing in this holding would affect Rhode Island's medical malpractice law. Allegations of negligence in the performance of an abortion should be handled in the same fashion as allegations of negligence in any medical procedure.

as defined by ACOG. It holds that the Act as currently written does not do that.

Therefore, this Court issues a permanent injunction against the enforcement of Rhode Island's ban on partial birth abortions, R.I.Gen.Laws § 23–4.12. Plaintiffs shall draft a form of judgment containing that injunction. Also, plaintiffs may move, within 30 days of the date hereof, for attorneys' fees and costs based on a detailed, contemporaneous accounting as required by *Grendel's Den v. Larkin,* 749 F.2d 945, 952 (1st Cir.1984).

It is so Ordered.